634 A.2d 1109

**COMMONWEALTH of Pennsylvania, Appellant at No. 104 W.D. Appeal Docket 1991.**

v.

**Dave SCARPONE, Appellant at No. 103 W.D. Appeal Docket 1991.**

Supreme Court of Pennsylvania.

Argued Sept. 24, 1992.

Decided Dec. 15, 1993.

Robert J. Amelio, Pittsburgh, for Dave Scarpone.

Ernest D. Preate, Jr., Atty. Gen., Anthony Sarcione, Executive Deputy Atty. Gen., Robert A. Graci, Chief Deputy Atty. Gen., Andrea F. McKenna, Deputy Atty. Gen., Harrisburg, for Com.

Before NIX, C.J., FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## *OPINION OF THE COURT*

PAPADAKOS, Justice.

Two issues are presented for our consideration in this appeal by Dave Scarpone and the Commonwealth. These issues involve the Solid Waste Management Act (SWMA), Act of July 7, 1980, P.L. 380, as amended, 35 P.S. § 6018.101 et seq., specifically §§ 6018.606(f) and 6018.401, and the Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334, eff. June 6, 1973, as amended, 18 Pa.C.S. § 101 et seq., specifically § 5101.

Scarpone appeals from the affirmance of his conviction of obstructing the administration of law and other governmental function (18 Pa.C.S. § 5101) and the Commonwealth cross-appeals from the reversal of Scarpone's conviction of causing and assisting in the operation of a hazardous waste disposal

facility without a permit (35 P.S. §§ 6018.606(f) and 6018.401) 141 Pa.Commonwealth 560, 596 A.2d 892.

Dave Scarpone was the general manager of the Municipal and Industrial Disposal Company (MIDC) which is located in Elizabeth Township, Allegheny County. It operated a fly-ash disposal facility and a demolition waste disposal site. In 1979, the facility received a permit to dispose of various wastes including hazardous wastes. MIDC is owned by Scarpone's co-defendant at trial, William Fiore.

For each type of waste or "waste stream" which the company intended to receive at this site, it was required to submit a form or "module" to the Department of Environmental Resources (DER) for approval. The form known as "Module 1" indicates the type of waste, how it is generated, its chemical and physical characteristics, where it will be placed and how it will be disposed. The information is certified by an engineer employed by the landfill operator. DER then reviews the proposal to determine whether the particular waste stream is compatible with: 1) other waste deposited on that site, and 2) the site liner. Upon receipt of a module, DER's technical staff reviews it. DER will then either approve or reject the module. If rejected, the landfill operator may not deposit this particular waste at his facility.

MIDC's disposal facility contained, *inter alia,* a Phase I disposal pit, a temporary disposal pit, and a demolition site. The facility was licensed to receive certain streams of hazardous waste and deposit them in the temporary pit and later the Phase I pit. The Phase I pit was lined with natural clay which had been found to be sufficient to contain the wastes and keep them from seeping out. After the Phase I pit was full, it was eventually to be closed and covered in order to return the site to its natural condition. In order to be sure that the hazardous wastes were not seep ig into the environment, various monitoring systems were established.

Running under the Phase I pit was an under-drain which was identified as pipe 810. This under-drain converges with the 711 pipe in a manhole near the pit and emits a single

discharge. The purpose of the under-drain was to convey mine water beneath the disposal pit carrying it away from the liner. If the liner failed, materials seeping out of the pit through the liner would appear in the under-drain.

In late 1982 and early to mid 1983, a DER Solid Waste Supervisor, Mr. Dan Peterson, during routine inspection visits, detected a strong organic odor coming from the manhole. He described this odor as very similar to the type of odor that one gets when one is around a disposal pit. Also, it was considered similar to odors one gets at a U.S. Steel coke-making facility. Numerous samples of the discharge from the 711 and 810 pipes were collected by the DER and tested at their laboratory in Harrisburg. The samples tested positive for the presence of organic chemicals (i.e., Benzene, Toluene and Xylene).

DER officials informed Mr. Fiore that no additional requests to dispose of hazardous wastes would be approved until the matter was resolved. Subsequently, several meetings were held between MIDC and DER officials. As a result of these discussions, MIDC and the Commonwealth entered into a "Consent Order and Agreement." The agreement provided that MIDC would apply for a water quality permit (NPDES) which would set certain limits on the chemicals discharged from the site. If the discharge exceeded those limits, MIDC agreed either to establish a treatment plant on the site or collect the discharge and transport it to a treatment plant.

Subsequently, in November of 1983, James R. Shack, a solid waste specialist for the DER, who took samples from both the 810 pipe and the 711 pipe, noticed that the discharge flow from the 810 pipe had lessened significantly and the odors no longer existed. On July 26, 1984, Mr. Shack observed that there was no discharge flow coming from the 810 pipe. Since he was curious about this phenomenon, Mr. Shack climbed down into the manhole and then maneuvered himself up into the 810 pipe. When he did so, he discovered that the 810 pipe had been capped with three or four metal plates.

Charles Kroll, a welder, testified that he was contacted and hired by Mr. Scarpone during the summer of 1983 to cap the 810 pipe, install an elbow pipe and another smaller pipe which led to a disposal pit which was not yet in use. Mr. Kroll also indicated that Mr. Scarpone directed this capping activity. Another welder, Elmer Holmes, testified that during the same time period, he was hired and directed by Mr. Scarpone to install a two-inch pipe below ground between two larger pipes. Stemming from the two-inch pipe was a stand pipe which stood perpendicular to it and reached the surface of the ground. Inside this stand pipe and attached to the two-inch pipe was a valve which, with the aid of a socket-type wrench, could be turned on and off.

The capping of the 810 pipe prevented the flow of water from under the Phase I pit into the 810–711 monitoring point. This was the discharge which previously had given off organic odors leading to the finding that hazardous wastes were seeping into the aquifer running under the pit. The newly installed connecting pipe brought water from the unopened disposal pit to a point in front of the cap. Had this alteration not been made, the capping of the 810 pipe would have prevented any flow at all at the monitoring point. A third alteration consisted of a hidden pipe operated by a buried valve covered over with rocks. When the valve was opened, this pipe permitted the drainage which had backed up behind the cap of the 810 pipe to flow through the monitoring point and on into an unnamed tributary of the Youghiogheny River. Employees of MIDC testified that they observed Mr. Scarpone, and others, open this valve at night and on weekends when DER officials were not likely to appear to check the monitoring point.

Although Mr. Scarpone and Mr. Fiore were not charged with polluting the waterways, the Commonwealth's evidence established that when the valve was turned on, a discharge flowed from the outfall pipe into the tributary. Samples of this discharge were collected in small stainless steel buckets. These samples were transmitted to the DER laboratory in Harrisburg where they were analyzed by DER chemists. The

samples all contained hazardous wastes. Two former MIDC employees testified that on various occasions they were present when Mr. Scarpone personally opened the valve or ordered other persons to open the valve.

When DER discovered the alterations, it filed criminal charges against both Fiore and Scarpone in the Court of Common Pleas of Allegheny County. After a jury trial, Mr. Scarpone was found guilty of violating the SWMA by causing and assisting in the operation of a hazardous waste disposal facility without a permit (35 P.S. §§ 6018.606(f) and 6018.401); obstructing the administration of law and other governmental function (18 Pa.C.S. § 5101); and criminal conspiracy (18 Pa.C.S. § 903). Post-trial motions were timely filed and denied.

Mr. Scarpone was sentenced to pay a fine of $5,000.00 and to serve a period of incarceration of not less than 11½ months nor more than 23 months. A motion to reconsider was denied and appeal to the Commonwealth Court followed. The Commonwealth Court reversed Scarpone's conviction of causing and assisting in the operation of a hazardous waste facility without a permit, and affirmed the obstruction (6018.606(f) and 6018.401) and conspiracy (18 Pa.C.S. § 903) convictions. The Commonwealth challenges the reversal of the permit conviction and Scarpone challenges the affirmance only of the obstruction charge. We granted review in this case because of a conflict between the intermediate appellate courts in deciding the permit issue. Scarpone and his co-defendant Fiore were both charged with and found guilty of operating without a permit.

Scarpone took his appeal to the Commonwealth Court and that court found it impossible to conclude that the alteration of the pipe resulted in the operation of a new facility for which no permit had been issued. Although the facility may have acted in breach of the permit it held, the court would not hold that this was tantamount to acting without any permit.

Fiore took his appeal to the Superior Court and raised the issue by way of a sufficiency of the evidence argument. The

Superior Court found the evidence sufficient and issued an unpublished memorandum opinion upholding his conviction of operating a hazardous waste facility without a permit. The two courts are clearly in conflict and this leaves the Attorney General's office ill-advised on how it should proceed in such situations.

■ We find that the Commonwealth did not make out the crime of operating a waste disposal facility without a permit against Mr. Scarpone under the statute. Simply put, Mr. Scarpone did have a permit. A more appropriate charge may have been brought under alternative provisions of the statute, viz, 35 P.S. §§ 6018.606(g) and 6018.601.

Section 35 P.S. § 6018.606(g) of the SWMA makes it a first degree felony for "[a]ny person who intentionally, knowingly or recklessly stores, transports, treats, or disposes of hazardous waste within the Commonwealth in violation of any provision of this act, and whose acts or omissions cause pollution, a public nuisance or bodily injury to any person . . .". 35 P.S. § 6018.601(a) provides that a violation of "any term or condition of any permit, shall constitute a public nuisance." Hence, the SWMA has specific provisions providing a penalty for violations of the conditions of a permit. Under such circumstances, the Commonwealth *must* adhere to the legislative scheme in pursuing criminal charges. The alteration of the monitoring pipe here was execrable and constituted a clear violation of the conditions of the permit. But to conclude that the alteration constituted the operation of a new facility *without a permit* is a bald fiction we cannot endorse. Penal provisions of a statute must be strictly construed under 1 Pa.C.S. § 1928(b)(1).

We agree with the Commonwealth Court that the statutory language here cannot be stretched to include criminal activities which clearly fall under another statutory section or subsection. The Commonwealth Court was right in reversing Mr. Scarpone's conviction of operating without a permit when the facility clearly had one.

■ Mr. Scarpone was also charged with and convicted of obstructing a government function under 18 Pa.C.S. § 5101. That statute reads:

A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

Mr. Scarpone argued to the Commonwealth Court that he could not be convicted of this crime because there was no "affirmative interference with governmental functions." He appeared to argue that there must be some sort of actual physical interference with the DER inspectors as they perform their duties in order for a violation under this section to occur. In his direct appeal to us, Mr. Scarpone has cited no persuasive authority which supports this theory and, like the Commonwealth Court, we are satisfied that what took place here was affirmative interference with a governmental function. Mr. Scarpone's conviction on this charge must be affirmed.

For the reasons set forth above, the Commonwealth Court's setting aside of Mr. Scarpone's conviction of operating a hazardous waste facility without a permit is affirmed. Mr. Scarpone's conviction of obstructing the administration of law or other governmental function is affirmed.

LARSEN, J., did not participate in the consideration or decision of this case.

ZAPPALA, J., concurs in the result.