833 So.2d 739 (2002)
Clyde Timothy BUNKLEY, Petitioner,
v.
STATE of Florida, Respondent.
No. SC01-297.
Supreme Court of Florida.
November 21, 2002.
*740 R. John Cole, II, Sarasota, FL, for Petitioner.
Richard E. Doran, Attorney General, Robert J. Krauss, Senior Assistant Attorney General, Chief of Criminal Law, and Ronald Napolitano, Assistant Attorney General, Tampa, FL, for Respondent.
SHAW, J.
We have for review Bunkley v. State, 768 So.2d 510 (Fla. 2d DCA 2000), wherein the district court certified the following question:
Should the decision in L.B. v. State, 700 So.2d 370 (Fla.1997), that a folding pocketknife with a blade of four inches or less falls within the statutory exception to the definition of a "weapon" found in § 790.001(13), be applied retroactively?
Bunkley, 768 So.2d at 511. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. We answer in the negative, as explained herein.

I. FACTS
Bunkley burglarized an unoccupied Western Sizzlin' Restaurant on April 23, 1987. He was arrested at the scene and later charged with and convicted of armed burglary, possession of burglary tools, and resisting arrest without violence. In light of his fifteen prior convictions, he was sentenced to life imprisonment on the armed burglary count, five years' imprisonment on the possession of burglary tools count, and six months' imprisonment on the resisting arrest count. His convictions *741 and sentences were affirmed.[1]
Bunkley subsequently sought postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 and the relevant facts are set forth in the district court opinion below:
Bunkley was convicted of armed burglary after a jury trial on April 23, 1987. The arresting officer testified as to the following facts: Bunkley broke into a closed, unoccupied Western Sizzlin' Restaurant in the early morning hours, and was apprehended after leaving the structure with a common pocketknife in his pocket. At the time of Bunkley's arrest, the pocketknife, with a blade of 2½ to 3 inches in length, was folded and in his pocket. There is no evidence indicating Bunkley ever used the pocketknife during the burglary, nor that he threatened anyone with the pocketknife at any time.
In his rule 3.850 motion, Bunkley contends the trial court erroneously allowed the jury to determine whether the pocketknife found in his possession could be considered a deadly weapon, rather than concluding it was not as a matter of law. Bunkley concedes that his motion was filed more than two years after his convictions on April 23, 1987, became final. He contends, however, that the arguments raised in his motion were not supported by case law until the supreme court decided L.B. v. State, 700 So.2d 370 (Fla.1997), and that he filed his motion within two years from the date of that decision.
In L.B., the Florida Supreme Court reversed this court's decision finding section 790.001(13), Florida Statutes (1995), unconstitutionally vague. At issue was the exclusion of a "common pocketknife" from the definition of "weapon" in section 790.001(13). The Florida Supreme Court found that the statutory term was not so vague as to fail to put people of ordinary intelligence on notice of what constitutes forbidden conduct under the statute. To define the term, the court relied upon an Attorney General's opinion that a common pocketknife was one with a blade of four inches or less.
Bunkley, 768 So.2d at 510 (citations omitted). The district court declined to apply L.B. retroactively, affirmed the denial of rule 3.850 relief, and certified the above question.
The issue presented in this case, i.e., whether a decision of this Court must be applied retroactively, is a pure question of law, subject to de novo review.[2]

II. L.B. v. STATE

The petitioner in L.B. v. State, 700 So.2d 370 (Fla.1997), was charged with and convicted of possessing a "weapon" on school grounds based on her possession of a folding knife with a 3¾-inch blade:
At trial, the court considered whether petitioner's knife fit within the "common pocketknife" exception to the definition of "weapon" contained in section 790.001(13), Florida Statutes (1995). Section 790.001(13) provides:
"Weapon" means any dirk, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon except a firearm or a common pocketknife.
The trial court found that petitioner's knife was too large to be considered a *742 "common pocketknife," and was therefore a "weapon" within the meaning of sections 790.001(13) and 790.115(2). Accordingly, the trial court found appellant guilty of the violation.
On appeal, the Second District vacated the trial court's order and remanded the case for a new trial. The district court held that section 790.001(13) is unconstitutionally vague insofar as it excludes "common pocketknives" from the definition of "weapon."
L.B., 700 So.2d at 371 (footnote and citations omitted).
This Court disagreed that the phrase "common pocketknife" was unconstitutionally vague:
The legislature's failure to define the term "common pocketknife" in section 790.001(13) does not render that term unconstitutionally vague. Moreover, a court may refer to a dictionary to ascertain the plain and ordinary meaning which the legislature intended to ascribe to the term.
[The Court then set forth dictionary definitions of the terms "common" and "pocketknife."] From these definitions, we can infer that the legislature's intended definition of "common pocketknife" was: "A type of knife occurring frequently in the community which has a blade that folds into the handle and that can be carried in one's pocket." We believe that in the vast majority of cases, it will be evident to citizens and fact-finders whether one's pocketknife is a "common" pocketknife under any intended definition of that term.
L.B., 700 So.2d at 372 (citations omitted).
The Court concluded that the petitioner's knife plainly fell within the meaning of "common pocketknife" but added the following caveat:
We note that neither the Attorney General nor this Court maintains that four inches is a bright line cutoff for determining whether a particular knife is a "common pocketknife." We merely hold that appellant's knife fits within the exception to the definition of weapon found in section 790.001(13).
L.B., 700 So.2d at 373 n. 4.

III. THE APPLICABLE STATUTES
The burglary statute, which differentiates between simple and armed burglary, provides in relevant part:
810.02 Burglary.
(1) "Burglary" means entering or remaining in a structure or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
(2) Burglary is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment... if, in the course of committing the offense, the offender:
. . . .
(b) Is armed, or arms himself within such structure or conveyance, with explosives or a dangerous weapon.

(3) ... Otherwise, burglary is a felony of the third degree, punishable [by a term of imprisonment not exceeding five years].
§ 810.02, Fla. Stat. (1985) (emphasis added).
The phrase "dangerous weapon" has appeared in the above statute since it was enacted in 1895[3] and is not defined therein. To determine the meaning of that phrase, courts traditionally have turned to chapter 790, Florida Statutes, entitled "Weapons and Firearms." Section 790.001 *743 defines the term "weapon" and expressly excepts a "common pocketknife":
(13) "Weapon" means any dirk, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon except a firearm or a common pocketknife.

§ 790.001(13), Fla. Stat. (1985) (emphasis added).[4] This definition was based on the description of "weapon" found in the precursor statute, section 790.01, which was enacted in 1901 and also excepted a "common pocketknife."[5]

IV. CHANGES IN THE LAW
Intent is a polestar that guides a court's inquiry into whether a change in the law should be given prospective or retroactive application. As a rule, a change in the statutory law is presumed to operate prospectively absent a clear showing of contrary intent.[6] A change in the decisional law in a nonfinal case, on the other hand, is presumed to operate in all other nonfinal cases.[7] A change in either the statutory or decisional law may operate retroactively when retroactive application is expressly provided,[8] but regardless of intent, the issue of retroactivity is ultimately controlled by overarching constitutional principles.
The Court in Witt v. State, 387 So.2d 922 (Fla.1980), was confronted with the following question: must a change in the law that is announced in a nonfinal case be applied in final cases?[9] The Court held that only "jurisprudential upheavals" will be applied in final cases, and that "evolutionary refinements" in the law will not be applied in final cases. The Court explained:
We emphasize at this point that only major constitutional changes of law will be cognizable ... under Rule 3.850. Although specific determinations regarding the significance of various legal developments must be made on a case-by-case basis, history shows that most major constitutional changes are likely to fall within two broad categories. The first are those changes of law which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties. This category is exemplified by Coker v. Georgia, which held that the imposition of the death penalty for the crime of rape of an adult woman is forbidden by the eighth amendment as cruel and unusual punishment. The second are those changes of law which are of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall *744 and Linkletter [v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)]. Gideon v. Wainwright, of course, is the prime example of a law change included within this category.
In contrast to these jurisprudential upheavals are evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights of this genre, do not compel an abridgment of the finality of judgments. To allow them that impact would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit.
Witt, 387 So.2d at 929-30 (citations and footnotes omitted).
In brief, changes in the decisional law are divided into two subgroups for retroactivity purposes. A "jurisprudential upheaval" is a major constitutional change of law, announced by either this Court or the United States Supreme Court, that addresses a basic unfairness in the system. The unfairness must be so fundamental that it undermines confidence in the validity of final cases and outweighs the doctrine of finality.[10] An "evolutionary refinement," on the other hand, is a conventional change that affords new or different guidelines for Florida courts in exercising their authority in applying the law.[11] Jurisprudential upheavals are applied retroactively; evolutionary refinements are not applied retroactively. We add that, as opposed to "changes" in the law, an entirely separate body of precedent, i.e., "clarifications" in the law, has no application under Florida law in the context of retroactivity.[12]

*745 V. THE PRESENT CASE
In analyzing the retroactivity of L.B. under Witt, we are called upon to determine whether L.B. was a "jurisprudential upheaval" or an "evolutionary refinement" in the law. As noted above, a jurisprudential upheaval is a "major constitutional change of law." Examples include Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). L.B. clearly was not a decision of that order, for L.B. was a routine statutory construction case wherein this Court construed the phrase "common pocketknife."
Rather, L.B. was an "evolutionary refinement" in the law, i.e., it was a conventional change that "affords new or different guidelines" for the courts in applying the law. To determine whether a decision refines a statute, we first look to the decision itself to discern its intent. If the decision is silent or ambiguous on this point, we then look to the statute to discern its intent. Where the Legislature cedes a measure of discretion to the courts either directly[13] or by employing language that commonly requires judicial construction,[14] the Legislature intends for the courts to effectuate the purpose of the statute by "refining" the decisional law in the face of "evolving" circumstances.
The Legislature, at the turn of the century, ceded discretion to the courts by employing the phrases "dangerous weapon" and "common pocketknife" in the burglary and weapon statutes, and these phrases clearly required judicial construction in order to provide a meaningful basis for imposing sanctions. This Court's decision in L.B., which was issued in 1997, was the culmination of a century-long evolutionary process. Although some courts during that period may have interpreted "common pocketknife" contrary to the holding in L.B., each court nevertheless sought to comply with legislative intent and to rule in harmony with the law as it was interpreted at that point in time. A key consideration is that none of the courts attempted to impose criminal sanctions without statutory authorityi.e., none ruled in contravention of legislative intent. Thus, none of the convictions imposed pursuant to section 790.001(13) violated the Due Process Clause in this regard.

VI. CONCLUSION
This Court's decision in L.B. is not a jurisprudential upheaval under Witt, for *746 L.B. was not a "major constitutional change of law." Rather, L.B. was a routine statutory construction case wherein this Court construed and refined the phrase "common pocketknife" in the face of evolving circumstances in the field. The decision thus "affords new or different" guidelines for Florida courts to use in applying the statute and is an evolutionary refinement in the law.
We answer the certified question in the negative and hold that L.B. cannot be given retroactive application and applied to final cases. We approve Bunkley v. State, 768 So.2d 510 (Fla. 2d DCA 2000), as explained herein.
It is so ordered.
WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
PARIENTE, J., dissents with an opinion, in which ANSTEAD, C.J., concurs.
PARIENTE, J., dissenting.
I dissent because in my opinion under the recent United States Supreme Court decision in Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), this Court's decision in L.B. v. State, 700 So.2d 370 (Fla.1997), should be applied to grant Bunkley collateral relief. If Fiore is deemed inapplicable, then in my view Bunkley is still entitled to relief based on the principles of retroactivity articulated in Witt v. State, 387 So.2d 922 (Fla.1980).
In this case, Bunkley was convicted of armed burglary in 1987 for breaking into an unoccupied restaurant, and received a life sentence. See Bunkley v. State, 768 So.2d 510, 510 (Fla. 2d DCA 2000). The "weapon" that enhanced the burglary from simple burglary to armed burglary was a common pocketknife with a blade of two-and-a-half to three inches that was folded in his pocket at the time of the burglary. See id. There was "no evidence indicating that Bunkley ever used the pocketknife during the burglary, nor that he threatened anyone with the pocketknife at any time." Id. At all pertinent times, section 790.001(13), Florida Statutes (1985), expressly excepted a "common pocketknife" from the definition of a "weapon." Subsequent to Bunkley's conviction, this Court in L.B. held for the first time that the proper definition of a "common pocketknife" included any pocketknife with a blade four inches in length or less. See 700 So.2d at 373. Thus, any common pocketknife with a blade of four inches or less was not a "weapon" as a matter of law under section 790.001(13), the weapons statute. See id.
In my view, the principles of due process enunciated in Fiore require that Bunkley receive the benefit of the Court's clarification of the law in L.B. Fiore holds that constitutional principles of due process are violated when a state convicts and incarcerates an individual for conduct that the state's "criminal statute, as properly interpreted, does not prohibit." 531 U.S. at 228, 121 S.Ct. 712. At issue in Fiore was an opinion of the Pennsylvania Supreme Court that for the first time established that a criminal statute, as properly interpreted, did not prohibit the defendant's conduct at the time of the conviction. See id. In those circumstances, the United States Supreme Court explained that the state supreme court had issued a clarification of the law that applied to that defendant, and retroactivity was not an issue. See id. The Court explained:
This Court's precedents make clear that Fiore's conviction and continued incarceration on this charge violate due process. We have held that the Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the *747 elements of that crime beyond a reasonable doubt. In this case, failure to possess a permit is a basic element of the crime of which Fiore was convicted....
The simple, inevitable conclusion is that Fiore's conviction fails to satisfy the Federal Constitution's demands.
Id. at 228-29, 121 S.Ct. 712 (emphasis supplied) (citations omitted).
This Court recently acknowledged Fiore`s applicability to Florida law in State v. Klayman, 835 So.2d 248 (Fla. 2002). In Klayman, a majority of this Court stated that "a simple clarification in the law does not present an issue of retroactivity and thus does not lend itself to a Witt analysis." Id. 835 So.2d at 252. Yet, in this case, instead of analyzing why L.B. was not a clarification in the law entitling Bunkley to relief, the majority concludes, without discussion, that Fiore is not applicable. See majority op. at 744-45, note 12. Rather than discussing Fiore, which does not involve a retroactivity analysis, the majority analyzes L.B. based only on the principles of Witt, concluding that L.B. was "the culmination of a century-long evolutionary process." Majority op. at 745-46. However, the majority offers no precedent laying out the stages of this evolution.
In fact, L.B. was the first statement by this Court as to what constitutes a "common pocketknife." In reaching this determination we relied on a 1951 Attorney General Opinion, not on a definition evolved through judicial precedent. See L.B., 700 So.2d at 373. Thus, I would find Fiore applicable to this case.
As in Fiore, this Court's statement of the law in L.B. also correctly stated the law at the time Bunkley's conviction became final. Further, like the Pennsylvania Supreme Court's clarification of its law in Fiore, the armed burglary statute as "properly interpreted," Fiore, 531 U.S. at 228, 121 S.Ct. 712, places Bunkley's conduct outside the scope of that statute. In Fiore`s terms, this Court issued a "clarification" of the law of what constitutes a "common pocketknife" under section 790.001(13). Thus, as in Fiore, Bunkley's "continued incarceration" on this charge violates due process because the essential element of possessing a "weapon" in order to be convicted of armed burglary does not exist in Bunkley's case.
Because L.B. is a clarification of the law, application of the due process principles of Fiore renders a retroactivity analysis under Witt unnecessary. However, assuming, as the majority does, that our decision in L.B. was a change in the law and not a clarification, Bunkley is also entitled to relief pursuant to Witt.
Witt outlined three requirements that decisional law must meet in order to be applied retroactively. See 387 So.2d at 931. First, the decisional law must be issued by the Florida Supreme Court or the United States Supreme Court. See id. Second, the decisional law must be constitutional in nature. See id. Third, the change in law must constitute a major constitutional change of fundamental significance "where unfairness [is] so fundamental in either process or substance that the doctrine of finality [has] to be set aside." Id. at 927. There are two categories of changes that are sufficient to constitute fundamental significance: (1) "changes of law which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties" and (2) "jurisprudential upheavals" that meet the three-part test from Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Witt, 387 So.2d at 929.
*748 Our decision in L.B. undoubtedly meets the first two prongs of Witt. First, L.B. was decided by this Court. See 700 So.2d at 373. Second, our decision in L.B. answered the question of whether the statute providing that a "common pocketknife" is not a "weapon" was unconstitutionally vague. See id. In answering that question in the negative, this Court held in the context of Florida constitutional law that any knife with a blade of less than four inches was not a "weapon" within the meaning of the statute. See id. at 372-73. Indeed, the definition of "common pocketknife" we provided in L.B. was necessary to avoid a finding that the statute at issue was so vague as to unconstitutionally fail to give citizens proper notice as to what constituted criminal conduct. See id. at 371-73. Thus, our decision in L.B. was more than a "routine statutory construction case." Majority op. at 745 (emphasis supplied). Rather, L.B. construed a statute within the framework of our state constitution in order to ensure that citizens had legal notice at the time of the commission of the offense and to avoid declaring the statute unconstitutional, as the Second District had done. Therefore, L.B. had strong due process implications, making it constitutional in nature. Cf. Callaway v. State, 642 So.2d 636, 640 (Fla. 2d DCA 1994) (decision is "constitutional in nature" if based primarily upon constitutional analysis), approved, 658 So.2d 983 (Fla.1995).
As to the third prong, I would hold that L.B. also meets the three-fold test articulated in Stovall and adopted by Witt. Under Stovall, consideration must be given to (i) the purpose to be served by the new rule, (ii) the extent of reliance on the old rule, and (iii) the effect that retroactive application of the rule will have on the administration of justice. See 388 U.S. at 297, 87 S.Ct. 1967. First, L.B. serves two significant purposes. Primarily, L.B. prevents persons from being convicted of a crime for conduct never expressly prohibited by statute. L.B. also ensures that citizens are properly placed on notice as to what constitutes criminal conduct. Both of these purposes have strong due process implications. See State v. Stevens, 714 So.2d 347, 348 (Fla.1998) (extending retroactivity to a decision holding that a 25-year mandatory minimum term was inapplicable to attempted second- and third-degree murder of a law enforcement officer "from the beginning" of statutory provision authorizing enhanced sentence); see also Fiore, 531 U.S. at 228-29, 121 S.Ct. 712; Callaway, 642 So.2d at 640.
Second, Stovall requires that we consider the extent of reliance on the old rule. Although "common pocketknife" has been exempted from the definition of a "weapon" for many years, the extent of reliance is limited to very narrow circumstances. As this Court recognized in L.B., in "the vast majority of cases it will be evident whether one's particular knife is a `common pocketknife.'" 700 So.2d at 373.
The third factor for consideration under Stovall addresses the impact that retroactive application of the new rule will have on the administration of justice. Bunkley filed his motion for postconviction relief within two years from the date that L.B. became final. See Bunkley, 768 So.2d at 510. The retroactive application of L.B., which would give affected inmates a two-year window to file for relief, would involve a straightforward legal issue and require, at most, a simple evidentiary hearing to determine the length of the blade of the pocketknife. Only those defendants who could establish that the weapon they possessed was a common pocketknife of four inches or less would be entitled to relief.[15] *749 As in Callaway, 658 So.2d at 988, the record will normally be clear, and a determination concerning the length of the pocketknife should be accomplished easily at an evidentiary hearing.
As an overall consideration, this Court has held that when determining retroactivity, the "fundamental consideration is the balancing of the need for decisional finality against the concern for fairness and uniformity in individual cases." Id. at 986. In the ordinary case, decisional finality will trump other considerations, especially where the decision is one that applies "new or different standards for the admissibility of evidence" or pertains to issues of "procedural fairness." Witt, 387 So.2d at 929. "In the limited number of decisions that are retroactively applied, we have determined that concerns for basic fairness and uniformity of treatment among similarly situated defendants outweigh any adverse impact that retroactive application of the rule might have on decisional finality." Dixon v. State, 730 So.2d 265, 267 (Fla. 1999)
In my view, this case is one of those limited number of decisions where retroactive application is required. As a result of L.B., we now know that Bunkley was convicted of the crime of "armed" burglary when the essential element of possessing a "weapon" was missing. Because of this conviction, he was eligible for and received a sentence of life imprisonment. With this Court's clarification in L.B. of what constitutes a "common pocketknife," the maximum sentence Bunkley could have received for simple burglary would have been five years. See § 810.02(3), Fla. Stat. (1985). Thus, Bunkley not only was convicted for conduct that the statute has never prohibited, but he is serving a substantially longer prison term.
The fair administration of justice would be seriously undermined if a criminal defendant, such as Bunkley, is required to serve a life sentence while a criminal defendant who engaged in the same conduct subsequent to L.B. is required to serve only five years. Cf. State v. Callaway, 658 So.2d at 987 (noting that "the administration of justice would be more detrimentally affected if criminal defendants who had the misfortune to be sentenced during the six year window between the amendment of section 775.084 and the decision in Hale [v. State, 630 So.2d 521 (Fla.1993)] are required to serve sentences two or more times as long as similarly situated defendants who happened to be sentenced after Hale"). Bunkley should thus be entitled to the benefit of this Court's decision in L.B. because the failure to give retroactive application of our decision in L.B. results in Bunkley serving a substantially longer sentence than a similarly situated prisoner.
The majority cites State v. Woodley, 695 So.2d 297, 298 (Fla.1997) as support for declining to apply L.B. retroactively. See majority op. at 744. However, when we declined to find the decision in State v. Gray, 654 So.2d 552 (Fla.1995), retroactive in Woodley, we did so because we had receded from eleven years of our own precedent establishing attempted felony murder as a valid offense. See Woodley, 695 So.2d at 298; see also State v. Safford, 484 So.2d 1244 (Fla.1986) (declining to retroactively apply State v. Neil, 457 So.2d 481 (Fla.1984), which changed the long-standing rule in Florida that a party could never be required to explain the reasons for exercising peremptory challenges). In contrast, L.B. established as a *750 matter of first impression in this Court that a closed, common pocketknife with a blade of four inches or less does not meet the definition in section 790.001(13) of a "weapon." That definition was crucial to an essential element of the aggravated offense of armed burglary, which requires possessing a weapon.[16] Retroactivity under these circumstances would be consistent with Callaway and Stevens, which made first-time statutory interpretations by this Court based on constitutional grounds retroactive, and with Woodley, in which we declined to extend retroactivity to a decision receding from our own precedent.
Finally, I am concerned that the majority neither acknowledges nor discusses in the Witt analysis the fundamental purpose of due process and retroactive application; that is, ensuring fairness and uniformity of individual adjudications. See Witt, 387 So.2d at 925. It is difficult "`to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases.'" Id. These important principles of fundamental fairness are essential to any analysis regarding the retroactive application of decisions from this Court.
The bottom line is that our holding in L.B. clarified that Bunkley's possession of a folded common pocketknife did not constitute criminal conduct and thus he could not have been and should not have been convicted of armed burglary. He is now serving a sentence of life imprisonment based on that conviction for armed burglary. Under both Fiore and Witt, due process principles of fundamental fairness require that Bunkley be entitled to pursue collateral relief.
ANSTEAD, C.J., concurs.
NOTES
[1] See Bunkley v. State, 539 So.2d 477 (Fla. 2d DCA 1989).
[2] See State v. Glatzmayer, 789 So.2d 297, 301-02 n. 7 (Fla.2001) ("If the ruling consists of a pure question of law, the ruling is subject to de novo review.").
[3] See ch. 4405, § 1, at 167-68, Laws of Fla. (1895).
[4] See ch. 69-306, § 1, at 1106, Laws of Fla.
[5] See ch. 4928, § 1, at 57, Laws of Fla. (1901).
[6] See, e.g., Bates v. State, 750 So.2d 6, 10 (Fla.1999).
[7] See Smith v. State, 598 So.2d 1063 (Fla. 1992).
[8] See, e.g., Bates, 750 So.2d at 10.
[9] The Court in subsequent cases was confronted with the following question: must a change in the law that is announced in a final case be applied in other final cases? The Court answered as explained therein. See, e.g., Ferguson v. State, 789 So.2d 306 (Fla. 2001) (applying retroactively Carter v. State, 706 So.2d 873 (Fla.1997), wherein the Court held that a judicial determination of competency is required in certain postconviction cases); Johnston v. Moore, 789 So.2d 262 (Fla.2001) (declining to apply retroactively Stephens v. State, 748 So.2d 1028 (Fla.1999), wherein the Court announced a revised standard of review for ineffectiveness claims); Mitchell v. Moore, 786 So.2d 521 (Fla.2001) (applying retroactively the decision in the same case, i.e., Mitchell, wherein the Court held that a photocopy requirement for postconviction pleadings impermissibly burdened indigent defendants).
[10] For examples of jurisprudential upheavals, see the following: James v. State, 615 So.2d 668 (Fla.1993) (addressing Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), wherein Florida's jury instruction on the "heinous, atrocious, or cruel" aggravating circumstance was held to be impermissibly vague under the Eighth Amendment); Jackson v. Dugger, 547 So.2d 1197 (Fla.1989) (addressing Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), wherein the use of victim impact evidence in a capital trial was held to be irrelevant and impermissibly inflammatory in violation of the Eighth Amendment; the United States Supreme Court later receded from Booth in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)); Thompson v. Dugger, 515 So.2d 173 (Fla. 1987) (addressing Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), wherein Florida's jury instructions in capital cases were held to impermissibly limit the sentencer's consideration of nonstatutory mitigating circumstances in violation of the Eighth Amendment).
[11] For examples of evolutionary refinements, see the following: State v. Woodley, 695 So.2d 297 (Fla.1997) (addressing State v. Gray, 654 So.2d 552 (Fla.1995), wherein the Court held that the legal basis for the crime of attempted felony murder was too cumbersome to be countenanced any longer by the courts); State v. Glenn, 558 So.2d 4 (Fla.1990) (addressing Carawan v. State, 515 So.2d 161 (Fla.1987), wherein the Court announced a revised procedure for determining whether multiple convictions can arise from a single criminal act under Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)); McCuiston v. State, 534 So.2d 1144 (Fla.1988) (addressing Whitehead v. State, 498 So.2d 863 (Fla.1986), wherein the Court held that habitual offender status is an invalid ground for departure from the sentencing guidelines).
[12] The United States Supreme Court, in addressing a decision rendered under Pennsylvania law, pointed out that certain decisions are not subject to a retroactivity analysis:

The Pennsylvania Supreme Court's reply specifies that the interpretation of [the statute] set out in [Com. v.] Scarpone[, 535 Pa. 273, 634 A.2d 1109 (1993)] "merely clarified" the statute and was the law of Pennsylvania as properly interpretedat the time of Fiore's conviction. Because Scarpone was not new law, this case presents no issue of retroactivity.
Fiore v. White, 531 U.S. 225, 228, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001). Fiore is inapplicable to the present case.
[13] For example, the Legislature directly ceded to the courts the authority to formulate grounds for departing from the sentencing guidelines. See § 921.001(6), Fla. Stat. (2001) ("A court may impose a departure sentence outside the sentencing guidelines based upon circumstances or factors which reasonably justify the aggravation or mitigation of the sentence....").
[14] Examples of such language include "careful and prudent," "reasonable," and "probable cause." See, e.g., § 316.1925, Fla. Stat. (2001) ("Any person operating a vehicle upon the streets or highways within the state shall drive the same in a careful and prudent manner....") (emphasis added); § 856.015(2), Fla. Stat. (2001) ("No adult having control of any residence shall allow an open house party to take place at said residence if any alcoholic beverage or drug is possessed or consumed... by any minor ... and where the adult fails to take reasonable steps to prevent the possession or consumption of the alcoholic beverage or drug.") (emphasis added); § 933.04, Fla. Stat. (2001) ("[N]o search warrant shall be issued except upon probable cause ....") (emphasis added).
[15] It should be noted that in reported opinions issued in the almost five years since L.B., the Second District opinion in this case is the sole reported appellate decision discussing the retroactivity of L.B.
[16] Subsequent to L.B., the Legislature amended section 790.115, Florida Statutes, to specifically prohibit any "knife" from being exhibited on school grounds. See State v. A.M., 765 So.2d 927 (Fla.2d DCA 2000). This legislation does not alter the definition of weapon in section 790.001(13) or the incorporation of that definition into the armed burglary provision under which Bunkley was convicted.