# BUNKLEY *v.* FLORIDA

No. 02–8636.  Decided May 27, 2003

PER CURIAM.

Clyde Timothy Bunkley petitions for a writ of certiorari, arguing that the Florida Supreme Court contradicted the principles of this Court's decision in *Fiore* v. *White*, 531 U. S. 225 (2001) *(per curiam)*, when it failed to determine whether the "common pocketknife" exception to Florida's definition of a "'[w]eapon'" encompassed Bunkley's pocketknife at the time that his conviction became final in 1989. Fla. Stat. § 790.001(13) (2000). We agree, and therefore grant Bunkley's motion to proceed *in forma pauperis* and his petition for a writ of certiorari.

I

In the early morning hours of April 16, 1986, Bunkley burglarized a closed, unoccupied Western Sizzlin' Restaurant. Report and Recommendation in No. 91–113–CIV–T–99(B) (MD Fla.), p. 1. The police arrested him after he left the restaurant. At the time of his arrest, the police discovered a "pocketknife, with a blade of 2½ to 3 inches in length, . . . folded and in his pocket." 768 So. 2d 510 (Fla. App. 2000) *(per curiam)*. "There is no evidence indicating Bunkley ever used the pocketknife during the burglary, nor that he threatened anyone with the pocketknife at any time." *Ibid.*

Bunkley was charged with burglary in the first degree because he was armed with a "dangerous weapon"—namely, the pocketknife. Fla. Stat. § 810.02(2)(b) (2000). The punishment for burglary in the first degree is "imprisonment

for a term of years not exceeding life imprisonment." § 810.02(2). If the pocketknife had not been classified as a "dangerous weapon," Bunkley would have been charged with burglary in the third degree. See 833 So. 2d 739, 742 (Fla. 2002). Burglary in the third degree is punishable "by a term of imprisonment not exceeding 5 years." Fla. Stat. § 775.082(3)(d) (2002); see also 833 So. 2d, at 742. Bunkley was convicted of burglary in the first degree. He was sentenced to life imprisonment. In 1989, a Florida appellate court affirmed Bunkley's conviction and sentence. See 539 So. 2d 477.

Florida law defines a " '[w]eapon' " to "mea[n] any dirk, metallic knuckles, slingshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon except a firearm or a common pocketknife." § 790.001(13). Florida has excepted the " 'common pocketknife' " from its weapons statute since 1901, and the relevant language has remained unchanged since that time. See 833 So. 2d, at 743.

In 1997, the Florida Supreme Court interpreted the meaning of the "common pocketknife" exception for the first time. In *L. B.* v. *State*, 700 So. 2d 370, 373 *(per curiam)*, the court determined that a pocketknife with a blade of 3¾ inches "plainly falls within the statutory exception to the definition of 'weapon' found in section 790.001(13)." The complete analysis of the Florida Supreme Court on this issue was as follows: "In 1951, the Attorney General of Florida opined that a pocketknife with a blade of four inches in length or less was a 'common pocketknife.' The knife appellant carried, which had a 3¾-inch blade, clearly fell within this range." *Ibid.* (citation omitted). The Florida Supreme Court accordingly vacated the conviction in *L. B.* because the "knife in question was a 'common pocketknife' under any intended definition of that term." *Ibid.* Justice Grimes, joined by Justice Wells, wrote an opinion agreeing with the majority's resolution of the case "[i]n view of the Attorney General's opinion and the absence of a more definitive description of a common pocketknife." *Ibid.*

After the Florida Supreme Court issued its decision in *L. B.*, Bunkley filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 (1999). Bunkley alleged that under the *L. B.* decision, his pocketknife could not have been considered a "weapon" under § 790.001(13). He therefore argued that his conviction for armed burglary was invalid and should be vacated because a "common pocketknife can not [sic] support a conviction involving possession of a weapon." App. to Pet. for Cert. C–2. The Circuit Court rejected Bunkley's motion, and the District Court of Appeal of Florida, Second District, affirmed. 768 So. 2d 510 (2000).

The Florida Supreme Court also rejected Bunkley's claim. It held that the *L. B.* decision did not apply retroactively. Under Florida law, only "jurisprudential upheavals" will be applied retroactively. 833 So. 2d, at 743 (internal quotation marks omitted). The court stated that a "jurisprudential upheaval is a *major* constitutional change of law." *Id.*, at 745 (internal quotation marks omitted). By contrast, any "evolutionary refinements" in the law "are not applied retroactively." *Id.*, at 744. The court then held that *L. B.* was an evolutionary refinement in the law, and therefore Bunkley was not entitled to relief. In a footnote, the Florida Supreme Court cited our decision in *Fiore* v. *White, supra,* and held without analysis that *Fiore* did not apply to this case. See 833 So. 2d, at 744, n. 12.*

---

*The dissent claims that the Florida Supreme Court did not need to decide anything other than whether *L. B.* was a change in the law. See *post,* at 845 (citing Fla. Rule Crim. Proc. 3.850(b)(2) (2000)). Yet as the dissent concedes, see *post,* at 843, the Florida Supreme Court passed upon the *Fiore* due process inquiry as well as the retroactivity question. The dissent also notes that Bunkley has raised the issue of the common pocketknife in prior appeals. These appeals, however, were filed *prior* to the Florida Supreme Court's opinion in *L. B.* And we agree with the dissent that absent the *L. B.* decision, Bunkley would not be able to pursue his claim now. The Florida Supreme Court committed an error of law here by not addressing whether the *L. B.* decision means that at the time Bunk-

Justice Pariente, joined by Chief Justice Anstead, dissented. She stated that the Florida Supreme Court's decision in *L. B.* "should be applied to grant Bunkley collateral relief." 833 So. 2d, at 746. She criticized the majority opinion for relying solely on a retroactivity question. In her view, "application of the due process principles of *Fiore* renders a retroactivity analysis . . . unnecessary." *Id.*, at 747. She noted that even if *L. B.* was merely an evolutionary refinement of the law, "the majority offers no precedent laying out the stages of this evolution." 833 So. 2d, at 747. Because she thought the *L. B.* decision "correctly stated the law at the time Bunkley's conviction became final," she would have vacated Bunkley's conviction. 833 So. 2d, at 747.

## II

*Fiore* v. *White* involved a Pennsylvania criminal statute that the Pennsylvania Supreme Court interpreted for the first time after the defendant Fiore's conviction became final. See 531 U. S., at 226. Under the Pennsylvania Supreme Court's interpretation of the criminal statute, Fiore could not have been guilty of the crime for which he was convicted. See *id.*, at 227–228. We originally granted certiorari in *Fiore* to consider "when, or whether, the Federal Due Process Clause requires a State to apply a new interpretation of a state criminal statute retroactively to cases on collateral review." *Id.*, at 226. "Because we were uncertain whether the Pennsylvania Supreme Court's decision . . . represented a change in the law," we certified a question to the Pennsylvania Supreme Court. *Id.*, at 228. This question asked whether the Pennsylvania Supreme Court's interpretation of the statute " 'state[d] the correct interpretation of the law of Pennsylvania at the date Fiore's conviction became final.' " *Ibid.*

---

ley was convicted, he was convicted of a crime—armed burglary—for which he may not be guilty. Therefore, *Michigan* v. *Long*, 463 U. S. 1032 (1983), has no applicability here.

When the Pennsylvania Supreme Court replied that the ruling " 'merely clarified the plain language of the statute,' " *ibid.*, the question on which we originally granted certiorari disappeared. Pennsylvania's answer revealed the "simple, inevitable conclusion" that Fiore's conviction violated due process. *Id.*, at 229. It has long been established by this Court that "the Due Process Clause . . . forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." *Id.*, at 228–229. Because Pennsylvania law—as interpreted by the later State Supreme Court decision—made clear that Fiore's conduct did not violate an element of the statute, his conviction did not satisfy the strictures of the Due Process Clause. Consequently, "retroactivity [was] not at issue." *Id.*, at 226.

*Fiore* controls the result here. As Justice Pariente stated in dissent, "application of the due process principles of *Fiore*" may render a retroactivity analysis "unnecessary." 833 So. 2d, at 747. The question here is not just one of retroactivity. Rather, as *Fiore* holds, "retroactivity is not at issue" if the Florida Supreme Court's interpretation of the "common pocketknife" exception in *L. B.* is "a correct statement of the law when [Bunkley's] conviction became final." 531 U. S., at 226. The proper question under *Fiore* is not whether the law has changed. Rather, *Fiore* requires that the Florida Supreme Court answer whether, in light of *L. B.*, Bunkley's pocketknife of 2½ to 3 inches fit within § 790.001(13)'s "common pocketknife" exception at the time his conviction became final.

Although the Florida Supreme Court has determined that the *L. B.* decision was merely an "evolutionary refinement" in the meaning of the "common pocketknife" exception, it has not answered whether the law in 1989 defined Bunkley's 2½- to 3-inch pocketknife as a "weapon" under § 790.001(13). Although the *L. B.* decision might have "culminat[ed] . . . [the] century-long evolutionary process," the question remains about what § 790.001(13) meant in 1989. 833 So. 2d, at 745.

If Bunkley's pocketknife fit within the "common pocketknife" exception to § 790.001(13) in 1989, then Bunkley was convicted of a crime for which he cannot be guilty—burglary in the first degree. And if the "stages" of § 790.001(13)'s "evolution" had not sufficiently progressed so that Bunkley's pocketknife was still a weapon in 1989, this case raises the issue left open in *Fiore.*

It is true that the Florida Supreme Court held *Fiore* inapplicable because the *L. B.* decision was a change in the law which "culminat[ed] [the] century-long evolutionary process." 833 So. 2d, at 745. As the dissent acknowledges, however, see *post,* at 843, n. 1, the Florida Supreme Court's decision in *L. B.* cast doubt on the validity of Bunkley's conviction. For the first time, the Florida Supreme Court interpreted the common pocketknife exception, and its interpretation covered the weapon Bunkley possessed at the time of his offense. In the face of such doubt, *Fiore* entitles Bunkley to a determination as to whether *L. B.* correctly stated the common pocketknife exception at the time he was convicted. Ordinarily, the Florida Supreme Court's holding that *L. B.* constitutes a change in—rather than a clarification of—the law would be sufficient to dispose of the *Fiore* question. By holding that a change in the law occurred, the Florida Supreme Court would thereby likewise have signaled that the common pocketknife exception was narrower at the time Bunkley was convicted.

Here, however, the Florida Supreme Court said more. It characterized *L. B.* as part of the "century-long evolutionary process." 833 So. 2d, at 745. Because Florida law was in a state of evolution over the course of these many years, we do not know what stage in the evolutionary process the law had reached at the time Bunkley was convicted. The Florida Supreme Court never asked whether the weapons statute had "evolved" by 1989 to such an extent that Bunkley's 2½- to 3-inch pocketknife fit within the "common pocketknife" exception. The proper question under *Fiore* is not

just *whether* the law changed. Rather, it is *when* the law changed. The Florida Supreme Court has not answered this question; instead, it appeared to assume that merely labeling *L. B.* as the "culmination" in the common pocketknife exception's "century-long evolutionary process" was sufficient to resolve the *Fiore* question. 833 So. 2d, at 745. It is not. Without further clarification from the Florida Supreme Court as to the content of the common pocketknife exception in 1989, we cannot know whether *L. B.* correctly stated the common pocketknife exception at the time he was convicted.

On remand, the Florida Supreme Court should consider whether, in light of the *L. B.* decision, Bunkley's pocketknife of 2½ to 3 inches fit within § 790.001(13)'s "common pocketknife" exception at the time his conviction became final. The judgment of the Supreme Court of Florida, accordingly, is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, dissenting.

The Court here makes new law, and does so without briefing or argument. In *Fiore* v. *White,* 528 U. S. 23, 29 (1999), we granted certiorari to answer whether due process requires a state court to apply a judicially announced change in state criminal law retroactively. We realized after granting certiorari, however, that we could not answer that question until we knew whether there had been a change in the law at all. We therefore certified a question to the Pennsylvania Supreme Court asking whether its decision in *Commonwealth* v. *Scarpone,* 535 Pa. 273, 279, 634 A. 2d 1109, 1112 (1993), was a change in the law from the time of the defendant's conviction. When the Pennsylvania Supreme Court answered that there had been no change, we acknowledged that there was no question of retroactivity left for

us to answer. *Fiore* v. *White,* 531 U. S. 225, 226 (2001) *(per curiam).*

In the present case, the Court concedes that the Florida Supreme Court acknowledged our opinion in *Fiore.* The Florida Supreme Court concluded that its decision in *L. B.* v. *State,* 700 So. 2d 370 (1997) *(per curiam),* decided after petitioner's conviction became final, marked a change in Florida law. 833 So. 2d 739, 744, n. 12 (2002).[1] The state court therefore considered whether the change should be applied retroactively, and concluded that it should not be.

The Court recognizes, as it must, that the Florida Supreme Court concluded that *L. B.* was a change in the law from the time of petitioner's conviction. *Ante,* at 841 ("It is true that the Florida Supreme Court held . . . [that] the *L. B.* decision was a change in the law"). Yet the Court criticizes the Florida Supreme Court for thinking that conclusion "sufficient to dispose of the *Fiore* question." *Ibid.* The Court acknowledges that "[o]rdinarily, the Florida Supreme Court's holding that *L. B.* constitutes a change in—rather than a clarification of—the law would be sufficient to dispose of the *Fiore* question," but then holds that, because the Florida Supreme Court "characterized *L. B.* as part of the 'century-long evolutionary process,'" *Fiore* requires that court to answer an additional question: whether petitioner's knife fit within the "'common pocketknife'" exception at the time of his conviction. *Ante,* at 841.

*Fiore* requires no such thing. *Fiore* asked whether a change had occurred and, upon finding that none had, ended the inquiry. The Court here goes much further. It acknowledges that *L. B.* neither clarified the law that was in existence at the time of petitioner's conviction nor changed the law with retroactive effect. Yet it nonetheless insists

---

[1] Petitioner presents strong arguments in favor of his view that the bright-line rule set out in *L. B.* existed as a matter of Florida law at the time of his conviction. Pet. for Cert. 6. But the Florida Supreme Court concluded otherwise, and we may not revisit that question.

that the Florida Supreme Court reevaluate the sufficiency of the evidence in this case. See *ante*, at 840, 842 (holding that Florida Supreme Court must answer whether "Bunkley's pocketknife . . . fit within [Fla. Stat.] § 790.001(13)'s 'common pocketknife' exception at the time his conviction became final"). The Court announces this conclusion as a matter of *"Fiore"* without explaining why due process requires it. The Court's holding is a new one, and its criticism of the state court for failing to anticipate this holding is unjustified.[2] The Florida Supreme Court, moreover, has essentially answered the question on which the Court now remands.[3]

The Court's decision to expand *Fiore* is not only new, it also unjustifiably interferes with States' interest in finality. The Florida courts have already considered several times the question this Court now asks them to answer. On direct appeal, petitioner specifically argued that a knife with a

---

[2] The Court further criticizes the Florida Supreme Court for its workmanship in the decision under review. Thus, while it recognizes the Florida court's conclusion that *L. B.* did not state the law at the time of petitioner's conviction, the Court reprimands the Florida court for failing to reach its holding in a sufficiently clear manner. See, *e. g., ante*, at 842 ("Without further clarification from the Florida Supreme Court . . . we cannot know whether *L. B.* correctly stated the common pocketknife exception at the time [petitioner] was convicted"). This rebuke to the state court violates the well-established rule that this Court will not "require state courts to reconsider cases to clarify the grounds of their decisions." *Michigan* v. *Long*, 463 U. S. 1032, 1040 (1983); see also *id.*, at 1041 (noting the Court's desire to "avoi[d] the unsatisfactory and intrusive practice of requiring state courts to clarify their decisions to the satisfaction of this Court").

[3] The state court explained that "[a]lthough some courts" prior to *L. B.* "may have interpreted 'common pocketknife' contrary to the holding in *L. B.*, each court nevertheless sought to comply with legislative intent and to rule in harmony with the law as it was interpreted at that point in time." 833 So. 2d 739, 745 (Fla. 2002). Thus, the court explained, "none of the convictions imposed pursuant to section 790.001(13) violated the Due Process Clause." *Ibid.*

blade of less than four inches was a "common pocketknife," and he cited the 1951 opinion letter issued by the Florida Attorney General on this issue. Brief for Appellant in No. 88–1376 (Fla. Dist. Ct. App.), pp. 5–6. Petitioner also filed two motions for state postconviction relief challenging the sufficiency of the evidence with respect to the jury's conclusion that he was armed with a dangerous weapon. See Motion to Set Aside or Vacate Judgment and Sentence in No. 86–1070–CF–A–N1 (Fla. Cir. Ct.), p. 4; Petition to Invoke "All Writs" Jurisdiction in No. 85–778 (Fla. Sup. Ct.), p. 4.[4]

Florida has established a 2-year period of limitations for filing motions for postconviction relief. Florida Rule of Criminal Procedure 3.850 "provides an exception to the two-year time limitation for filing postconviction motions where 'a fundamental constitutional right asserted was not established within the period provided for herein and has been held to apply retroactively.'" 768 So. 2d 510, 511 (Fla. App. 2000) *(per curiam)* (quoting Fla. Rule Crim. Proc. 3.850(b)(2) (2000)). The Court's decision here overrides Florida's Rule, authorizing claims for postconviction relief where there has been a change in the law that has specifically been held *not* to apply retroactively.

The Court's holding expanding *Fiore* is striking, and the Court's decision to adopt it summarily is even more so. I would deny the petition for writ of certiorari.

---

[4] Petitioner also unsuccessfully raised this claim twice in Federal District Court. See Report and Recommendation in No. 91–113–CIV–T–99(B) (MD Fla.), p. 5; Memorandum of Law in Support of Petition for Writ of Habeas Corpus under U. S. C. Section 2254 in No. 96–405–Civ.–T–24C (MD Fla.), p. 5.