**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LATISHA MARIE BABB,
            *Petitioner-Appellee*,

v.

JENNIFER LOZOWSKY and E. K.
MCDANIEL,
            *Respondents-Appellants*.

No. 11-16784

D.C. No.
2:05-cv-00061-
PMP-RJJ

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
July 20, 2012—San Francisco, California

Filed January 11, 2013
Amended June 6, 2013

Before: A. Wallace Tashima, Richard R. Clifton,
and Mary H. Murguia, Circuit Judges.

Order;
Opinion by Judge Murguia

## SUMMARY[*]

### Habeas Corpus

The panel reversed the district court's grant of a 28 U.S.C. § 2254 habeas corpus petition challenging a murder and robbery conviction, due to an unconstitutional jury instruction given pursuant to *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992).

While petitioner Babb's direct appeal was pending, the Nevada Supreme Court invalidated the *Kazalyn* instruction in *Byford v. State*, 994 P.2d 700 (Nev. 2000), which held that the *Kazalyn* instruction blurred the three elements of first degree murder – willfulness, deliberation and premeditation – and relieved the state of its burden of proving each element of the crime. Although this Court granted habeas relief in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), based on a *Kazalyn* instruction, the Nevada Supreme Court subsequently clarified in *Nika v. State*, 198 P.3d 839 (Nev. 2008), that *Byford* announced a new interpretation of the state murder statute that changed the law, as opposed to clarifying it. The district court determined that it was bound by this Court's decision in *Polk* and granted habeas relief to Babb.

The panel first held that the Nevada state court unreasonably applied established federal law expressed in *Bunkley v. Florida*, 538 U.S. 835 (2003) (per curiam), and violated Babb's due process rights by not applying *Byford*. The panel explained that *Polk* did not control the outcome of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

this case because *Nika* undermined this Court's holding in *Polk* as to the constitutionality of the *Kazalyn* instruction. The panel further explained that *Byford* applied to Babb's case because newly declared constitutional rules must be applied to convictions that were not yet final at the time the change occurs.

The panel next held that the error was harmless because the panel was reasonably certain that no juror convicted Babb based on the theory of premeditation, given overwhelming evidence supporting the felony murder theory and the prosecutor's focus on that theory during closing argument.

The panel remanded for the district court to consider Babb's other claims, which were not addressed when the district court granted relief.

## COUNSEL

Lisa A. Rasmussen, Las Vegas, Nevada, for Petitioner-Appellee.

Adam L. Woodrum and Victor-Hugo Schulze, II, Office of the Nevada Attorney General, Las Vegas, Nevada, for Respondent-Appellant.

## ORDER

Petitioner–Appellee's motion to join the Federal Public Defender's amicus curiae brief is DENIED (Doc. 39).

Nevada Attorneys for Criminal Justice's motion for leave to file an amicus curiae brief in support of Petitioner–Appellee is GRANTED (Doc. 41).

The Opinion filed January 11, 2013, appearing at 704 F.3d 1246, is amended as follows:

1.  At slip op. 25, in the first sentence of the first full paragraph; 704 F.3d at 1258, in the first sentence of the first full paragraph, change "On federal habeas review, the Supreme Court certified a question to the Florida Supreme Court, asking whether, at the time Bunkley's conviction became final in 1989, his 2.5–3 inch pocketknife was a weapon under the law at that stage in its evolution" to "On federal habeas review, the Supreme Court remanded to the Florida Supreme Court to decide whether, at the time Bunkley's conviction became final in 1989, his 2.5–3 inch pocketknife was a weapon under the law at that stage in its evolution."

2.  At slip op. 25, in the third sentence in the first full paragraph; 704 F.3d at 1258, in the third sentence in the first full paragraph, change "The Supreme Court said that 'If Bunkley's pocketknife fit . . .'" to "The Supreme Court said that '[i]f Bunkley's pocketknife fit . . . .'"

3.  At slip op. 26, in the first sentence of the second full paragraph; 704 F.3d at 1259, in the first sentence of the first full paragraph, change ". . . but only certified a question to the Florida Supreme Court" to ". . . but only posed a question to the Florida Supreme Court."

4.  At slip op. 26, in the second sentence of the second full paragraph; 704 F.3d at 1259, in the second sentence of the

first full paragraph, change "Although the Supreme Court stopped short of holding that changes in state law must be applied to convictions that are not yet final, *Bunkley* confirmed that failing to apply such changes would have the same effect as failing to give retroactive application to a clarification; it would permit the state to convict individuals who are not guilty of a crime under the applicable law" to "We disagree. *Bunkley* made clear that its remand to the Florida Supreme Court was necessary because the state court had to determine "*when* the law changed," 538 U.S. at 842. If the state courts' interpretation of an offense had evolved so as to exculpate the defendant of an element of the offense *before* the defendant's conviction became final, then the failure to apply state law as it existed at that time would violate the defendant's due process rights; it would permit the state to convict people of crimes of which they are not guilty under the applicable law. *Id.* at 840, 841."

5. At slip op. 27, in the first full sentence of the paragraph continuing from slip op. 26; 704 F.3d at 1259, in the fourth sentence of the first full paragraph, change "While it does not constitute an express holding, *Bunkley* made clear that *Griffith*'s holding, requiring new rules to apply to convictions that are not yet final, extends to changes in state law that narrow the category of conduct that can be considered criminal" to "*Bunkley* clarified that *Griffith*'s holding, requiring new rules to apply to convictions that are not yet final, extends to changes in state law that narrow the category of conduct that can be considered criminal."

With these amendments, the panel has voted to deny Petitioner–Appellee Babb's and Respondent–Appellant Lozowsky's petitions for panel rehearing. Judge Clifton and

Judge Murguia vote to deny the petitions for rehearing en banc and Judge Tashima so recommends.

The full court has been advised of the petitions for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petitions for panel rehearing and the petitions for rehearing en banc are denied (Docs. 32, 33).

No further petitions for rehearing will be entertained in this case.

**IT IS SO ORDERED.**

---

## OPINION

MURGUIA, Circuit Judge:

Appellants–Respondents Jennifer Lozowsky, the Warden, and the Nevada Attorney General ("the State") appeal the district court's grant of a writ of habeas corpus to Appellee–Petitioner Latisha M. Babb pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Babb was convicted of first degree murder with a deadly weapon, and robbery with a deadly weapon, by a jury in Nevada state court for the murder of cab driver John Castro in connection with a robbery. The district court granted habeas relief, concluding that one of the instructions for first degree murder given in Babb's case, known as the *Kazalyn* instruction, violated her due process

rights and that the improper instruction did not constitute harmless error.

We **REVERSE**.

## Background

On October 26, 1997, cab driver John Castro was found shot in the head in Washoe County, Nevada. He ultimately died from the wound.

While investigating another shooting, police obtained warrants to search the home and vehicle of Babb's codefendant and live-in boyfriend, Shawn Harte. At the time the police stopped Harte in his car, Babb was with him. The police found a .22 caliber pistol, a spotlight, a hand-held radio, a magazine, and ammunition in the car. A shell casing had been found inside the victim's taxi cab. Forensic testing revealed that the shell casing had been fired from the gun found in Harte's car.

Information obtained from Harte led police to question Babb's other co-defendant, Weston Sirex ("Sirex"), who worked at a Reno taxi company. Sirex told the investigators:

> that it started out as a robbery, that they were northbound on Cold Springs Road, that he [Sirex] was looking out the window, that he [Sirex] turned around just in time to hear a shot and see the flash of a weapon, and that it wasn't supposed to happen that way, or that he [Sirex] didn't know it was going to happen that way.

Sirex also admitted to being party to discussions that a robbery and a killing would take place, although he said that the cab driver was not to be killed, unless absolutely necessary. Babb, Harte, and Sirex were tried together, and Sirex's statements to police were read to the jury during the trial.

Harte also eventually made statements to police, wherein he admitted to shooting Castro in the head. In addition, he confessed to being the shooter in a letter to a woman he had dated. He wrote:

> So this cab driver is just spurting off his mouth about how he got 'ripped off' $1000 cash earlier, blah blah blah. Now what could that all have been about? Drugs. . . . It's because of people like him that I don't have a son or daughter. . . .

> I chambered a round. . . . Point blank. An inch above the ear and two behind. Boom. That simple. That easy. No remorse. Honestly.

> I jumped up and let the cab coast right in front of a drug dealer's house in Cold Springs. Perfect. Windows were up, so it was noiseless. . . . We left. Went to Circus Circus. Played some games, gambled – continued our good time. Went to Taco Bell. And ate. Went home. Simple. Nothing to it. Just another chore, like taking out the trash, except easier. And funner.

The letter and Harte's statements to the police were also read to the jury.

Harte and Sirex did not testify at trial, and they did not mention Babb's involvement in their statements to the police. When Babb was interviewed by a newspaper reporter after her arrest, however, she made the following statements to the reporter admitting her involvement in the robbery:

> I was the driver.
>
> It was maybe a 15-minute plan. We weren't out to get this specific person.
>
> I jokingly said, "Let's rob a cab. It's easy enough." So we did.
>
> I didn't hear the gunshot. I didn't even know he was shot until I pulled up alongside the car and heard him [the driver] breathing.
>
> The cab stopped in Cold Springs, and I pulled in front of it.
>
> I looked and saw him in the front seat with his head rolled back.
>
> When I thought about it later, I kept hearing his breath.
>
> I thought maybe someone else would rob a cab and they'd think he did it. I was broke and I had just lost my job. I needed the money to pay my bills. I have a lot of debt.

For the money we got, that man's life wasn't worth it.

How do you tell people you were involved in a murder?  How will I tell my mom?

I acknowledge this happened and I feel bad. I have nothing to hide. What's done is done. This is forever, nobody will forget.  You see it on TV and you know that you did that.  I didn't want any of this.

Babb also did not testify at trial, but her statements to the reporter were read to the jury.

Babb was charged with robbing and murdering John Castro.  The jury was given the following instruction for first degree murder:

As it applies to this case Murder of the First Degree is:

a) Murder which is any kind of **willful, deliberate and premeditated killing**: or

b) **Murder which is committed in the perpetration of a Robbery**. Murder in the Second Degree is all other kinds of Murder.

Instruction 18 (emphases added).

The jury instructions also included the following instruction for first degree murder, sometimes referred to as the *Kazalyn* instruction, named for the Nevada Supreme

Court decision which approved it, *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992):

> the unlawful killing must be accompanied with deliberate and clear intent to take life in order to constitute Murder of the First Degree. The intent to kill must be the result of deliberate premeditation.
>
> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be instantaneous as successive thoughts of the mind. **For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder**.

Instruction 23 (emphasis added). The judge also instructed the jury to apply this definition of first degree murder "[u]nless felony murder applies."

The jury was given the following instruction for felony murder:

> Whenever death occurs during the perpetration of certain felonies, including Robbery, NRS 200.030 defines this as Murder

in the First Degree. This is known as the "felony murder rule."

Therefore, an unlawful killing of a human being, whether intentional, unintentional or accidental, which is committed in the perpetration of a Robbery, is Murder in the First Degree if there was in the mind of the defendants the specific intent to commit the crime of Robbery.

The specific intent to commit Robbery must be proven by the state beyond a reasonable doubt.

Instruction 20.[1]

---

[1] The jury was also instructed regarding first degree murder on an aiding and abetting theory. This instruction permitted the jury to find Babb guilty of first degree murder if she aided and abetted Harte in committing first degree murder:

In order to find Latisha Marie Babb . . . guilty of the crime of murder, as charged in Count I of the Indictment, you must be satisfied beyond a reasonable doubt that:

1. The crimes of Murder and Robbery were committed;

2. Latisha Marie Babb . . . aided and abetted such crimes.

3. Shawn Russell Harte, a co-principal, committed the crimes of Murder and Robbery, and

4. The crime of Murder was a natural and

The jury found Babb guilty of robbery with a deadly weapon and first degree murder with a deadly weapon. This was a general verdict, however, and did not specify under which theory the jury found Babb guilty of first degree murder. Babb was sentenced to two consecutive life sentences without parole for the murder conviction.[2] She was also sentenced to two consecutive terms of 72–180 months in prison for the robbery conviction, running concurrently with the murder sentence.

The Nevada Supreme Court affirmed Babb's conviction and sentence on direct appeal. On May 27, 2009, Babb filed a Second Amended Petition for Writ of Habeas Corpus in the United States District Court, District of Nevada. Ground twelve of the petition alleged that Babb was denied her Fifth and Fourteenth Amendment rights to due process and trial by an impartial jury because the state trial court failed to instruct the jury properly regarding premeditation and deliberation. In the last reasoned decision by the state court, the Nevada Supreme Court held:

> Appellant[] also challenge[s] the giving of Instruction 23, the "*Kazalyn* instruction," which was ultimately criticized in *Byford v. State*. Appellant[] argue[s] that the instruction

---

probable consequence of the commission of the crime of Robbery.

Instruction 22.

[2] When Babb participated in Castro's murder, Nevada law required courts to impose a second, consecutive sentence on a defendant who used a deadly weapon in the commission of a crime; the second sentence was to be of the same length as the first. *See* Nev. Rev. Stat. § 193.165 (1997).

> improperly merges the concepts of premeditation and deliberation and, therefore, reduces the State's burden of proof in violation of due process. . . . As we have recently held, the giving of the *Kazalyn* instruction in cases like this one, which preceded the *Byford* decision, constitutes neither plain nor constitutional error.

*Babb v. State*, No. 34195 (Nev. July 10, 2001) (footnotes omitted).

The district court granted relief on Babb's Fourteenth Amendment claim on the basis that: 1) the Ninth Circuit held in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), that the *Kazalyn* instruction was unconstitutional because it blurred the elements of premeditation and deliberation, thereby relieving the State of the burden of proving each element of a crime, as required by Supreme Court precedent; and 2) due process required that *Byford v. State*, 994 P.2d 700 (Nev. 2000), which narrowed the category of cases that could be considered murder, be applied to Babb, whose conviction was not final when *Byford* was decided.

The district court also conducted a harmless error analysis. The court determined that, because the jury was presented with multiple theories of first degree murder and delivered a general verdict, the impact of the improper instruction was unclear. Because the court had grave doubt about whether all jurors agreed that felony murder was the theory by which they found Babb guilty, the error was not harmless. The district court did not reach any of Babb's other claims for relief.

The State appeals the district court's judgment granting the writ.

## Standard of Review

This Court reviews de novo a district court's decision to grant or deny a petition for the writ of habeas corpus under 28 U.S.C. § 2254. *Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir. 2011). The Court reviews findings of fact for clear error. *Id*. Mixed questions of law and fact involving constitutional issues are reviewed de novo. *Id*. Under AEDPA, a habeas petitioner cannot obtain relief based on a claim adjudicated on the merits in state court unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Under AEDPA, "clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

## Analysis

### I.  Background of Nevada's *Kazalyn* Instruction

The Nevada statutes define first degree murder, in relevant part, as murder perpetrated by "willful, deliberate and premeditated killing." Nev. Rev. Stat. § 200.030(1)(a). In *Kazalyn*, the Nevada Supreme Court approved the instruction for first degree murder that is at the center of Babb's habeas claim:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.

> Premeditation need not be for a day, an hour or even a minute.  It may be as instantaneous as successive thoughts of the mind.  **If the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder**.

825 P.2d at 583 (emphasis added).

Eight years later, in *Byford*, the Nevada Supreme Court determined that the *Kazalyn* instruction was deficient because it defined only premeditation, and failed to provide an independent definition for deliberation.  994 P.2d at 713.  The Nevada Supreme Court in *Byford* noted that in its prior decisions, the terms premeditated, deliberate and willful were considered a single phrase rather than independent elements of the *mens rea* for first degree murder.  *Id*. (citing *Greene v. State*, 931 P.2d 54, 61 (Nev. 1997); *Powell v. State*, 838 P.2d 921, 926–27 (Nev. 1992), *vacated on other grounds by* 511 U.S. 79 (1994); and *Scott v. State*, 554 P.2d 735, 737 n.2 (Nev. 1976)).  The court determined that, by failing to treat the terms as independent elements, the *Kazalyn* instruction improperly blurred the distinction between first and second degree murder.  *Id*. at 713.  The Nevada Supreme Court also noted that "[i]t is clear from the statute that *all three elements*, willfulness, deliberation, and premeditation, must

be proven beyond a reasonable doubt before an accused can be convicted of first degree murder." *Id.* at 713–14 (internal citations and quotation marks omitted). *Byford* set out instructions providing separate definitions for willfulness,

deliberation and premeditation.[3]   The *Byford* court did not

---

[3] The new instructions provide:

Murder of the first degree is murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing. All three elements – willfulness, deliberation and premeditation – must be proven beyond a reasonable doubt before an accused can be convicted of first degree murder.

Wilfulness is the intent to kill. There need be no appreciable space of time between formation of the intent to kill and the act of killing.

Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action.

A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.

Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.

Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.

The law does not undertake to measure in units of

cite any constitutional basis for its ruling.  *Id*. at 714–15.

After *Byford*, the Nevada Supreme Court held in *Garner v. State*, 6 P.3d 1013, 1025 (Nev. 2000), *overruled on other grounds by Sharma v. State*, 56 P.3d (Nev. 2002), that the new first degree murder instructions would not be applied to cases whose appeals were pending on direct review at the time *Byford* was decided.  The *Garner* court noted that although newly declared constitutional rules had to be applied to cases pending on direct appeal, *Byford* had no constitutional basis.  *Id*. at 1025 (citing *Griffith v. Kentucky*, 479 U.S. 314 (1987)).

In 2007, this Court granted habeas corpus relief under 28 U.S.C. § 2254 to a Nevada inmate who claimed that the *Kazalyn* instruction violated his right to a fair trial under the Fifth and Fourteenth Amendments.  *Polk*, 503 F.3d at 913. The *Polk* Court noted that, although the Nevada Supreme Court in *Byford* had not addressed the constitutional implications of its decision, the *Kazalyn* instruction violated

---

time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.  The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection.  A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

*Byford*, 994 P.2d at 714–15.

federal due process because it relieved the state of the burden of proving all elements of the crime by permitting the jury to find willful, deliberate, and premeditated murder so long as it found premeditation. *Id*. at 910. The Court specifically quoted language in *Byford* stating that it was clear from the statute that all three elements had to be proved beyond a reasonable doubt. *Id.* This Court thus concluded that by relieving the State of the burden of proving each element beyond a reasonable doubt, the *Kazalyn* instruction violated established federal law, including *In re Winship*, 397 U.S. 358, 364 (1970), *Francis v. Franklin*, 471 U.S. 307 (1985) and *Sandstrom v. Montana*, 442 U.S. 510 (1979). *Id.* at 911.

Subsequently, however, the Nevada Supreme Court held in *Nika v. State*, 198 P.3d 839, 849 (Nev. 2008), that the *Byford* decision was not a clarification of the murder statute – that is, *Byford* had not righted prior decisions' incorrect interpretations of Nevada's murder statute. Rather, the *Nika* court explained, *Byford* had announced a new interpretation of the murder statute, which changed the law. *Id*. The *Nika* court declared that any language in *Byford* and *Garner* suggesting that *Byford* was a clarification rather than a new rule was dicta. *Id*. at 849–50. According to *Nika*, this Court in *Polk* was wrong in concluding that the *Kazalyn* instruction was a violation of due process because the instruction accurately represented the elements of first degree murder up until *Byford* was decided. Thus, before *Byford* was decided, the *Kazalyn* instruction did not improperly relieve the State of the burden of proving all the elements of first degree murder. *Id*. at 850.

The *Nika* court also determined, however, that its prior decision in *Garner* wrongly held that the federal Constitution did not require application of the new rule to convictions that

were not yet final at the time *Byford* was decided. The *Nika* decision explained that because the change effected by *Byford* narrowed the scope of the criminal statute, it should, as a matter of due process, apply to anyone whose conviction was not final at the time *Byford* was decided. *Id*. (citing *Bunkley v. Florida*, 538 U.S. 835, 841–42 (2003) (per curiam)).

## II.  Babb's claim for habeas relief

### A. Babb's claim that the *Kazalyn* instruction is unconstitutional because it omits an element of premeditated murder.

The district court held that because the *Kazalyn* instruction failed to provide a definition of deliberation that was independent of premeditation, the instruction was unconstitutional. The district court thus concluded that it was bound by this Court's holding in *Polk*, despite the Nevada Supreme Court's subsequent holding in *Nika* that *Byford* represented a change in, rather than a clarification of, the law. On appeal, the State argues that after the *Nika* decision, *Polk* does not control the outcome of this case. We agree with the State.

The Nevada Supreme Court's decision in *Nika* made clear that under pre-*Byford* law, premeditation, deliberation and wilfulness were not distinct and independent elements of first degree murder, and that *Byford*'s decision requiring separate definitions for these terms represented a change in, rather than a clarification of, the law. There is an important distinction between decisions that clarify the law and decisions that change the law. A clarification is essentially a "correction" that provides the proper interpretation of a statute, whereas a change in the law is a new court-created

rule. *Fiore v. White*, 531 U.S. 225, 228 (2001). Federal due process requires that a state vacate a conviction, even a final conviction that has been affirmed on appeal, where a clarification reveals that a defendant was convicted "for conduct that [the state's] criminal statute, as properly interpreted, does not prohibit." *Id*.

There was language in *Byford* suggesting that the decision represented a clarification of the law. The *Byford* court stated, for instance, that "[i]t is clear from the statute that *all three elements*, willfulness, deliberation, and premeditation, must be proven beyond a reasonable doubt before an accused can be convicted of first degree murder." 994 P.2d at 713–14 (internal quotation marks and citation omitted). There are also portions of *Byford*, however, that indicate that the terms premeditated and deliberate were not distinct elements. *Id*. (noting that "deliberate" and "premeditated" were previously both included in jury instructions without being individually defined and citing *Greene*, 931 P.2d at 61, which said "the terms premeditated, deliberate and willful were a single phrase, meaning simply that the actor intended to commit the act and intended death as a result of the act"). *Nika* made clear that *Byford* represented a change in the law, and that any language in *Byford* suggesting it was a clarification was dicta. 198 P.3d at 850. Whether a particular decision represents a change in, or clarification of, the law is a matter of state law. *See Fiore*, 531 U.S. at 228 (noting uncertainty regarding whether decision represented clarification or change in law and certifying question to Pennsylvania Supreme Court); *see also Bunkley*, 538 U.S at 842 (noting state court decision represented change in state law and certifying question to Florida Supreme Court regarding when change occurred).

The *Nika* decision explaining that *Byford* represented a change in, rather than a clarification of, law undermines the basis of this Court's holding in *Polk* with regard to the constitutionality of the *Kazalyn* instruction. *Polk* was premised on the understanding that the Nevada murder statute mandated separate definitions of deliberation and premeditation. 503 F.3d at 910 (citing portion of *Nika* stating, "[i]t is clear from the statute that *all three elements*, willfulness, deliberation, and premeditation, must be proven beyond a reasonable doubt before an accused can be convicted of first degree murder"). "[W]here the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Because the Nevada Supreme Court, which is the ultimate authority in interpreting and deciding questions of Nevada state law, explained in *Nika* that *Byford* was a change in, rather than a clarification of, the law concerning premeditated murder, *Polk*'s holding has been disapproved (effectively overruled by *Nika*) and therefore does not govern the outcome of this case.[4] *Cf. United States v. Flores-Meja*, 687 F.3d 1213, 1215 (9th Cir. 2012) (concluding that because California Supreme Court decision did not change elements of robbery, Ninth Circuit precedent still governed).

Babb argues that *Polk*'s holding survives *Nika* and that by failing to provide an independent definition of deliberation,

---

[4] *Chambers v. McDaniel*, 549 F.3d 1191 (9th Cir. 2008), which held that the *Kazalyn* instruction was unconstitutional, citing *Polk*, was decided before *Nika*, and so is also not controlling here.

the *Kazalyn* instruction violated her due process rights even if *Byford* was a change in the law. We disagree. The *Kazalyn* instruction did not treat deliberation and premeditation as distinct elements of the mens rea for first degree murder requiring independent definitions because, as *Nika* explained, they were not separate elements under Nevada law until *Byford*. Although the Supreme Court has held that jury instructions omitting an element of the crime unconstitutionally diminish the state's burden, *see, e.g.*, *United States v. Gaudin*, 515 U.S. 506, 509–10, 522–23 (1995); *Neder v. United States*, 527 U.S. 11–13 (1999), whether a term in a statute constitutes a distinct element of the crime with an independent definition is a question of state law. *See Schad v. Arizona*, 501 U.S. 624, 636 (1991) ("In cases, like this one, involving state criminal statutes . . . we are not free to substitute our own interpretation of state statutes for those of a State's courts. If a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law."); *see also Evanchyk v. Stewart*, 340 F.3d 933, 936 (9th Cir. 2003) (noting that the Arizona Supreme Court responded to certified question that intent to kill is an essential element of the offense of conspiracy to commit first degree murder). There is no constitutionally mandated definition of premeditation or deliberation, and whether these are independent elements with distinct meanings is a question of state law.[5]

---

[5] By way of example, federal law, like the Nevada murder statute, also defines first degree murder as any killing that is "willful, deliberate, malicious and premeditated." 18 U.S.C. § 1111. Model federal jury instructions, like the *Kazalyn* instruction, conflate the definitions of

*Polk* did not hold, and could not have held, that where a statute includes both premeditation and deliberation in its definition of the mens rea for first degree murder, it is a violation of due process if the jury instruction fails to provide independent definitions for each of those terms. After *Nika*, Babb's claim that the *Kazalyn* instruction violated her due process rights because it did not provide a distinct definition for deliberation must fail.

**B.   Babb's claim that the change in *Byford* should be applied to her because it narrowed the definition of premeditated murder before Babb's conviction became final.**

The district court also determined that, because the change in the law announced in *Byford* occurred before Babb's conviction became final, it was a violation of her due process rights not to apply the new instruction (which narrowed the scope of conduct that could be defined as premeditated murder) to her case. We agree with the district court.

The district court cited *Fiore* and *Bunkley* as the bases for its decision.[6]   In *Fiore*, the Supreme Court invalidated a

---

premeditation and deliberation, stating "Premeditation means with planning or deliberation." Kevin F. O'Malley, et. al., Federal Jury Prac. and Instr. § 45.03 (6th ed.); *accord* Ninth Cir. Model Criminal Jury Instructions 8.107 (Murder–First Degree); *see also United States v. Agofsky*, 516 F.3d 280, 282 n. 2 (5th Cir. 2008) ("a killing is 'premeditated' when it is the result of planning or deliberation").

[6]  The district court also cited *Nika*'s holding that the *Byford* instruction for premeditated murder should be applied to cases whose appeals were not final at the time *Byford* was decided. 198 P.3d at 850. Unless *Nika*'s

conviction based on a clarification of state law. 531 U.S. at 227. The petitioner in *Fiore* had been convicted under a Pennsylvania statute that prohibited operating a hazardous waste facility without a permit. *Id*. Although Fiore in fact had a permit, he deviated so far from the permit's terms that he was found to have violated the statute. *Id*. at 226–27. After his conviction became final, the Pennsylvania Supreme Court held that one who deviates from his permit's terms does not lack a permit and could not be found to be in violation of the statute. *Id*. at 227. Subsequently, Fiore petitioned for federal habeas corpus relief.

The Supreme Court granted certiorari, in part, to decide when or whether the federal Due Process Clause requires the retroactive application of a new interpretation of a state criminal statute. *Id.* In order to determine if that question was in fact presented, the Supreme Court certified a question to the Pennsylvania Supreme Court, asking whether its decision that someone with a permit could not violate the statute prohibiting operating a machine without a permit was a new interpretation (i.e. a change in the law) or a clarification (i.e. a correct statement of the law at the time Fiore's conviction became final). *Id.* The Pennsylvania

---

holding was premised on clearly established federal law, it would not form a basis for habeas relief under AEDPA. *See Bradley v. Duncan*, 315 F.3d 1091, 1100 (9th Cir. 2002) (noting that it is a federal due process violation, "not the state law error," that triggers habeas relief). The fact that the Nevada Supreme Court held in *Nika* that the *Byford* instruction should be applied to cases such as Babb's involving convictions that were not final at the time *Byford* was decided, is not dispositive under AEDPA because Nevada law is not clearly established federal law. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citing *Lewis v. Jeffers*, 497 U.S. 764 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.")).

Supreme Court responded that the interpretation "did not announce a new rule of law" but rather "clarified the plain language of the statute . . . furnish[ing] the proper statement of law at the date Fiore's conviction became final." *Id*. at 228. The Supreme Court held that, given that Pennsylvania's new ruling was not new law, the question was "simply whether Pennsylvania can, consistently with the federal Due Process Clause, convict Fiore for conduct that its criminal statute, as properly interpreted, does not prohibit." *Id.* The Supreme Court held that Fiore's conviction and continued incarceration violated due process, citing the rule that the State must prove the elements of a crime beyond a reasonable doubt. *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307, 316 (1979), and *In re Winship*, 397 U.S. at 364).

Because there had been a clarification in the law, the Supreme Court in *Fiore* did not decide whether or under what circumstances a change in state law should be applied to invalidate a prior conviction. The Supreme Court did subsequently address this issue, however, in *Bunkley*. As in *Fiore*, the Supreme Court in *Bunkley* considered the impact of a change in the interpretation of a state statute on a conviction. 538 U.S. at 838. The petitioner in *Bunkley* had been convicted of burglary in the first degree. Bunkley received a life sentence because he was carrying a pocketknife with a 2.5 to 3-inch blade at the time of the crime, which the jury concluded was a deadly weapon. *Id*. at 836–37. Although the statute created an exception for the "common pocketknife," the term was undefined. *Id.* at 837. If the pocketknife exception had applied, Bunkley could only have been convicted of burglary in the third degree, which had a maximum sentence of five years. *Id.* After Bunkley's conviction became final, the Florida Supreme Court determined that a knife with a blade of 3.75 inches plainly fell

within the exception. *Id.* Bunkley sought state habeas relief, but the Florida Supreme Court declined, stating that its ruling was an "evolutionary refinement in the law," *id.* at 838, which did not apply retroactively under Florida law.

On federal habeas review, the Supreme Court remanded to the Florida Supreme Court to decide whether, at the time Bunkley's conviction became final in 1989, his 2.5–3 inch pocketknife was a weapon under the law at that stage in its evolution. The Court understood that the Florida ruling represented a change in state law, and noted the importance of when the change occurred. The Supreme Court said that "[i]f Bunkley's pocketknife fit within the 'common pocketknife exception [] in 1989 [when his conviction became final], *then Bunkley was convicted of a crime for which he cannot be guilty . . . .*" *Id*. at 841 (emphasis added). The Supreme Court thus indicated that failing to apply a potentially exonerating change in the law to a conviction which was not final at the time of the change would have the same effect as failing to apply a clarification of the law; it would permit the state to convict someone without proving the elements of the crime in violation of the Due Process Clause. *Id.*

The rulings in *Bunkley* and *Fiore* confirm that the Supreme Court's holding in *Griffith v. Kentucky*, 479 U.S. 314 (1987) – that newly declared constitutional rules must be applied to convictions that were not yet final at the time the change occurs – extends to some changes in state law.[7] One

---

[7] The Supreme Court has also held that due process requires the retroactive application of substantive changes in federal law that narrow the scope of a criminal statute, and that this even extends to convictions that are final at the time of the change. *Bousley v. United States*, 523 U.S.

principle underlying *Griffith* is that it is a violation of due process to affirm a conviction "when the new ruling was that a trial court lacked authority to convict a criminal defendant in the first place." 479 U.S. at 324 (citing *United States v. Johnson*, 457 U.S. 537, 550 (1982)). This principle would necessarily apply to a change in the definition of the elements of mens rea for first degree murder. "New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa." *Schriro v. Summerlin*, 542 U.S. 348, 354 (2004).

While *Griffith* alone would not be sufficient to invalidate Babb's conviction because the change at issue was a change in state law, *see Murtishaw v. Woodford*, 255 F.3d 926, 955–56 (9th Cir. 2001), *Bunkley* confirmed that it is a violation of due process not to apply changes in state law to a petitioner's conviction that was not final at the time the change occurred. 538 U.S. at 841 ("If Bunkley's pocketknife fit within the 'common pocketknife' exception [before his conviction became final], then Bunkley was convicted of a crime for which he cannot be guilty.").

The State argues that *Bunkley* is merely persuasive authority, because the Supreme Court in that case did not actually hold that due process requires that changes in state law be applied to convictions that are not yet final, but only posed a question to the Florida Supreme Court. We disagree. *Bunkley* made clear that its remand to the Florida Supreme Court was necessary because the state court had to determine "*when* the law changed," 538 U.S. at 842. If the state courts'

614 (1998). Whether this principle of retroactivity extends to changes in state law is the question that was explicitly left open in both *Fiore* and *Bunkley*.

interpretation of an offense had evolved so as to exculpate the defendant of an element of the offense *before* the defendant's conviction became final, then the failure to apply state law as it existed at that time would violate the defendant's due process rights; it would permit the state to convict people of crimes of which they are not guilty under the applicable law. *Id.* at 840, 841. Thus, after the Supreme Court's decision in *Bunkley*, it was an unreasonable application of established federal law and a violation of Babb's due process rights for the Nevada court not to apply the change in *Byford*, which narrowed the category conduct that can be considered criminal, to her case. *Bunkley* clarified that *Griffith*'s holding, requiring new rules to apply to convictions that are not yet final, extends to changes in state law that narrow the category of conduct that can be considered criminal. *See Williams v. Taylor*, 529 U.S. 362, 407 (2000) (noting that "a state-court decision also involves an unreasonable application of [the Supreme Court's] precedent if the state court . . . unreasonably refuses to extend that principle to a new context where it should apply"). *Byford*, which narrowed the scope of conduct that could qualify as first degree murder by expanding and separating definitions of premeditation, deliberation and willfulness, should be applied to Babb's conviction, which was not final at the time *Byford* was decided.

## III.   Harmless Error

Although the Nevada state court unreasonably applied established federal law when it failed to apply the change in *Byford* to Babb, "a court must assess the prejudicial impact of constitutional error in a state court criminal trial." *Fry v. Pliler*, 551 U.S. 112, 121 (2007). We must ask whether there is a reasonable probability the error "'had substantial and

injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "[W]here the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the petitioner must win. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

The district court in this case concluded that the general verdict prevented it from determining whether the erroneous *Kazalyn* instruction had influenced the jury in Babb's case, and said that it harbored "grave doubts" concerning the harmlessness of the error.[8] The State claims that rather than apply the *Brecht* standard to assess the effect and influence of the erroneous instruction, the district court essentially treated the error here as a structural error, thus violating the Supreme Court's recent holding in *Hedgpeth v. Pulido*, 555 U.S. 57 (2008), that instructional errors occurring in the context of a general verdict must still be reviewed for harmless error.

Instructional errors are generally subject to harmless error review. *Neder*, 527 U.S. at 7; *California v. Roy*, 519 U.S. 2,

---

[8] Babb argues that the government waived the harmless error defense by failing to raise it before the district court. Because the district court addressed the issue, however, and because the parties thoroughly addressed it in their briefs before this Court, we consider it. *Selam v. Warm Springs Tribal Corr. Facility*, 134 F.3d 948, 952 (9th Cir. 1998) (citing *Willard v. California*, 812 F.2d 461, 465 (9th Cir. 1987), and addressing an issue not raised by parties because it was addressed by the district court); *see also Lott v. Mueller*, 304 F.3d 918, 925 (9th Cir. 2002) (noting that courts may address issues not raised before the district court where "the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court").

5 (1996) (per curiam); *Pope v. Illinois*, 481 U.S. 497, 501 (1987). General verdicts, however, which permit a jury to convict based on different possible theories – without specifying the theory that forms the basis of the verdict – can complicate this analysis. "A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth*, 555 U.S. at 58 (citing *Stromberg v. California*, 283 U.S. 359 (1931) and *Yates v. United States*, 354 U.S. 298 (1957)). Even in the context of a general verdict, however, instructional errors must still be subjected to harmless error review. *Id*.

In *Hedgpeth*, the Supreme Court reversed a decision by this Court that a conviction based on a general verdict constituted structural error. 555 U.S. at 62. The instructions included an unconstitutional error that permitted the jury to convict based on an invalid theory of guilt. This Court held that because it could not be "absolutely certain" that the jury had relied on a valid ground, such convictions were exempted as a whole from harmless error review. *Id*. (quoting *Pulido v. Chrones*, 487 F.3d 669, 676 (9th Cir. 2007)). The Supreme Court explained that following its decision in *Chapman v. California*, 386 US. 18 (1967), constitutional errors, such as instructional errors occurring in the context of a general verdict, should not be treated as structural errors. The Court explained that substantial and injurious effects should not be presumed simply because a general verdict form had been used, and remanded the case for harmless error review. 555 U.S. at 62.

The Supreme Court in *Hedgpeth* provided no guidance regarding how to assess the impact of an erroneous instruction in the context of a general verdict. Generally,

however, when considering whether erroneous instructions constitute harmless error, courts ask whether it is reasonably probable that the jury would still have convicted the petitioner on the proper instructions. *Belmontes v. Brown*, 414 F.3d 1094, 1139 (9th Cir. 2005) (construing *Brecht* to require "a reasonable probability" that the jury would have reached a different verdict), *rev'd on other grounds sub nom. Ayers v. Belmontes*, 549 U.S. 7 (2006).

Here, however, we need not inquire into the probability that the jury, if given the proper instruction on premeditated murder, would have convicted Babb *on that theory*, because although the trial court gave an erroneous instruction on premeditation, we can discern with reasonable probability that the jury instead convicted Babb on a valid felony murder theory. In order to convict Babb based on the felony murder theory, the jury only had to find that she was guilty of robbery, and that Castro was killed during the perpetration of the robbery. The jury found Babb guilty of robbery, and the facts in this case leave no doubt that Castro was killed in perpetration of the robbery. In addition, during closing argument, the prosecutor focused almost exclusively on the felony murder theory with regard to Babb. In light of this overwhelming evidence supporting the felony murder theory, we can be reasonably certain that no juror convicted Babb based on premeditation because the jury was specifically instructed to only consider premeditated murder if felony murder did not apply. *See, e.g.*, *United States v. Hastings*, 134 F.3d 235, 242 (4th Cir. 1998) (if the evidence that the jury "necessarily credited in order to convict the defendant under the instructions given . . . is such that the jury must have convicted the defendant on the legally adequate ground . . . instead of the legally inadequate ground, the conviction may be affirmed"). Under these circumstances, despite the

general verdict, the erroneous instructions constituted harmless error, and the district court erred in concluding otherwise.[9]

We emphasize that the issue is not simply whether we can be reasonably certain that the jury *could* have convicted Babb based on the valid theory of felony murder. *See Kotteakos*, 328 U.S. at 765 ("The inquiry cannot be merely whether there was enough to support the result."). The Supreme Court's point in *Hedgpeth*, that a combination of good and bad instructions should not be considered more pernicious than a single improper instruction, 555 U.S. at 61, is well taken. When reviewing convictions, however, this Court is limited in its ability to decipher a verdict, and cannot simply substitute its judgment for that of the fact finder. General verdict forms can further blur an already opaque decisionmaking process, leaving us with the sort of grave doubt that prevents us from concluding an error was harmless. *O'Neal*, 513 U.S. at 437. Here, however, we can be reasonably certain, based on the particular circumstances and instructions in this case, that the jury *did* convict Babb based on the valid felony murder theory and that the premeditation instruction did not have a substantial impact on the jury's decision.

Babb raised other claims in her petition which were not addressed by the district court. We thus remand the case to

---

[9] There is, of course, no way to be absolutely certain what leads a juror to a particular decision. As the Supreme Court emphasized in *Hedgpeth*, "absolute certainty" is not the standard for a court considering whether an error was harmless, and employing such a standard is tantamount to determining that all instructional errors occurring in the context of a general verdict are structural errors. 555 U.S. at 62.

give the district court the opportunity to consider these claims.

**REVERSED and REMANDED.**