Myron A. **GLADNEY**, Petitioner–Appellant,

v.

William **POLLARD**, Respondent–Appellee.

No. 13–3141.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 2014.

Decided Aug. 26, 2015.

William L. Gansner, Attorney, Office of the Attorney General Wisconsin Department of Justice, Madison, WI, for Respondent–Appellee.

Before BAUER and HAMILTON, Circuit Judges, and ELLIS, District Judge.*

HAMILTON, Circuit Judge.

■ Myron Gladney challenges his 1996 Wisconsin conviction for murdering Christopher Wilson. At trial, Gladney did not dispute that he intentionally killed Wilson, but he argued unsuccessfully that he should not be found guilty of first-degree intentional homicide because he acted in what Wisconsin calls "imperfect self-defense." Imperfect self-defense, unlike perfect self-defense, does not serve as a complete defense to the charge of first-degree intentional homicide but instead mitigates that charge down to second-degree intentional homicide. Over a decade later, Gladney filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that (1) his due process rights were violated because subsequent state case law cast doubt on whether he was convicted under the correct imperfect self-defense standard and (2) his trial counsel was constitutionally ineffective for failing to interview a witness who would have corroborated his self-defense theory. The district court concluded that the petition was untimely under 28 U.S.C. § 2244(d)(1) and rejected Gladney's theory that the statute of limitations did not apply to his claims because he has demonstrated actual innocence.

We affirm. Gladney's federal petition was filed far too late. Even if the limitations period could have been tolled until Gladney found out about his counsel's failure to interview the witness, his petition would still have been filed well outside the adjusted limitations period. Gladney's attempt to invoke the narrow actual innocence exception to disregard the time limits for seeking federal habeas relief, see *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), is not persuasive.

I. *Factual and Procedural Background*

Gladney killed Wilson in August 1996 when Gladney confronted Wilson about money Wilson owed him. According to Gladney, Wilson had robbed him at gunpoint several weeks earlier during a dice game. Gladney and Wilson knew each other prior to the robbery, so Gladney thought he would try to talk to Wilson about getting his money back. When Gladney ran into Wilson one week after the robbery, Wilson promised to return the money. When Gladney met up with him two weeks after that, however, Wilson had changed his mind and refused to honor his earlier promise.

Wilson's refusal to pay led to an argument that escalated quickly. Gladney testified that he hoped to end the argument and turned away from Wilson. But as he was doing so, he decided to take out his gun and hold it by his side. When Gladney was distracted by a car horn, Wilson rushed him and grabbed his wrist. They struggled for the gun. During that struggle, Gladney was shot in the arm, but he also shot Wilson multiple times, killing him.

The State charged Gladney with first-degree intentional homicide. At trial, Gladney did not argue that he had not intentionally shot and killed Wilson. He argued instead that he should not be found

* The Honorable Sara L. Ellis, United States District Judge for the Northern District of Illinois, sitting by designation.

guilty of first-degree intentional homicide because he acted in self-defense. Gladney testified at trial that he shot Wilson because he feared Wilson would gain control of his gun and kill him. Gladney argued that he had been particularly afraid given Wilson's reputation for violence and the earlier armed robbery. The jury rejected the self-defense theory and found Gladney guilty of first-degree intentional homicide. The court sentenced Gladney to life in prison without parole for a minimum of seventy-five years.

Over a decade later, and long after the first round of post-conviction review was complete, Gladney seeks post-conviction relief based on two developments that took place after his conviction became final. First, he argues that his trial counsel was ineffective for failing to interview Carl Calhoun, a man who had also been present at the robbery and could have corroborated Gladney's claim that Wilson had robbed him. Gladney claims he did not learn of his counsel's failure to interview Calhoun until 2010 when he happened to run into Calhoun in prison. At this chance meeting, Gladney asked Calhoun why he did not testify about the robbery at his trial. Calhoun explained that he had never been contacted by Gladney's lawyer.

Second, after Gladney's conviction became final, Wisconsin modified the standard for "imperfect self-defense," which can transform first-degree intentional homicide into second-degree intentional homicide with a much less severe sentence. Gladney presents this as a federal claim that his conviction violated the Due Process Clause of the Fourteenth Amendment because the State was permitted to convict him without proving all of the elements of intentional first-degree murder. See *Fiore v. White,* 531 U.S. 225, 228–29, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001) (per curiam).

Under Wisconsin law, to convict a person of first-degree intentional homicide the State is required to defeat any credible claim of self-defense. Wis. Stat. § 940.01(3). Gladney claims that the State was not required to do so here because it was given the option of defeating his imperfect self-defense claim merely by attacking the objective reasonableness of his threshold belief that he was preventing or terminating an unlawful interference with his person. At the time of his trial, this accurately stated the law of imperfect self-defense in Wisconsin. See *State v. Camacho,* 176 Wis.2d 860, 501 N.W.2d 380, 388–89 (1993). After Gladney's trial, however, the Wisconsin Supreme Court held that the State cannot defeat a claim of imperfect self-defense by arguing that the defendant's threshold belief was objectively unreasonable. See *State v. Head,* 255 Wis.2d 194, 648 N.W.2d 413, 434, 437 (2002) (explicitly modifying this part of *Camacho* ). Now, the only way the State can defeat such a claim is by proving that the defendant did not subjectively believe the amount of force used was necessary to prevent death or great bodily harm to himself. *Id.*

Gladney's state conviction became final on January 12, 1999. He did not file his federal habeas petition until July 17, 2013. The district court ordered Gladney to show cause why his petition should not be dismissed as untimely. The court explained that unless some form of statutory or equitable tolling applied, Gladney's petition was untimely because he would have needed to file his federal petition by January 12, 2000, one year after his state court conviction became final. See 28 U.S.C. § 2244(d)(1)(A).

The district court rejected Gladney's attempts to toll the limitations period—either statutorily or equitably—based on his 2010 discovery that his lawyer had failed

to interview Calhoun. The district court also concluded that Gladney had failed to establish that he should be exempt from the limitations period altogether because he was actually innocent of his crime of conviction. The district court dismissed the petition as untimely and decided not to issue a certificate of appealability.

Gladney appealed. We granted a certificate of appealability on both of his constitutional claims and also directed the parties to address the timeliness questions presented by the petition. We asked the parties to address whether the petition might be considered timely and, if not, whether Gladney can demonstrate that he is entitled to an equitable exception to § 2244(d)(1)'s timeliness requirements because he is actually innocent of his crime of conviction.

## II. Timeliness of Federal Habeas Petitions

### A. Determination of the Limitations Period

■ Under 28 U.S.C. § 2244(d)(1)(A), a state prisoner seeking federal habeas relief has just one year after his conviction becomes final in state court to file his federal petition. Gladney was convicted by a jury on November 21, 1996. Wisconsin courts may elect to conduct direct review of a conviction at the same time they review a post-conviction petition, and that is what happened here. See Socha v. Boughton, 763 F.3d 674, 678 (7th Cir.2014). Simultaneous review does not change the time when the limitations clock starts under § 2244(d)(1). See id. at 678–79. For purposes of § 2244(d)(1)(A), therefore, the limitations period expired on January 12, 2000, which was one year after the date Gladney could no longer seek certiorari from the Wisconsin Supreme Court's October 14, 1998 decision to deny review. See

Morales v. Boatwright, 580 F.3d 653, 657 (7th Cir.2009).

Gladney did not file either of the two state post-conviction petitions raising the claims on which his federal petition is based until much later. He filed the first on October 5, 2009 and the second petition on April 7, 2010. Though the clock did not run from the time Gladney filed his October 5, 2009 petition in state court to its resolution on May 14, 2012, when the Wisconsin Supreme Court denied review of both petitions, see § 2244(d)(2); Carter v. Litscher, 275 F.3d 663, 665–66 (7th Cir. 2001), Gladney's July 17, 2013 federal filing was still well outside the one-year limitations period that began when his conviction first became final back in January 1999.

This appeal centers on whether Gladney has a legally viable basis for allowing such a late federal habeas petition. We agree with the district court that he does not. We consider first, and briefly, Gladney's arguments for statutory or equitable tolling, and then his argument for actual innocence based on his theory of imperfect self-defense.

### B. Tolling the Limitations Period

Gladney gestures in the direction of statutory tolling under § 2244(d)(1)(D) as well as equitable tolling under Holland v. Florida, 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) (counsel abandoned petitioner), as bases for finding his petition timely. But he concedes correctly that his petition would still be late even if we gave him the benefit of generous tolling under either theory.

■ Under § 2244(d)(1)(D), a petitioner has an additional year to file any claim starting from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Under equita-

ble tolling principles, a petitioner need not count the time during which he (1) pursues his rights diligently, and (2) "some extraordinary circumstance stood in his way and prevented timely filing." *Holland,* 560 U.S. at 649, 130 S.Ct. 2549 (citation and internal quotation marks omitted).

Gladney's only asserted basis for either form of tolling is that he could not have filed a petition alleging the claims he does now until his February 4, 2010 discovery that his attorney failed to interview Calhoun as part of his trial preparation.[1] Even if all other criteria were satisfied, a new one-year limitations period would have expired on February 4, 2011 unless Gladney stopped the clock by seeking post-conviction review in state court. See § 2244(d)(2). As noted above, Gladney had state court post-conviction petitions pending on at least one of the claims beginning on October 5, 2009. This was enough to stop the clock until the Wisconsin Supreme Court denied review of those petitions on May 14, 2012. See *Carter,* 275 F.3d at 665–66. That generous calculation would yield a new federal filing deadline of May 14, 2013, and Gladney's July 17, 2013 filing would still have been two months late. Because no form of tolling he seeks would render his petition timely, we need not address the underlying details of Gladney's tolling arguments.

## C. *Actual Innocence Gateway*

Gladney's last theory for avoiding the one-year time limit is to argue for an equitable exception to § 2244(d)(1) based on a claim of actual innocence. See *McQuiggin v. Perkins,* 569 U.S. ——, 133 S.Ct. 1924, 1931, 185 L.Ed.2d 1019 (2013) (describing difference between equitable excuse that permits *extending* a time limit and equitable exception that renders a time limit *inapplicable* ). Gladney argues that he can avoid his procedural default because he is actually innocent of his crime of conviction—first-degree intentional homicide—under the standard articulated in *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

■ The Supreme Court has not recognized a petitioner's right to habeas relief based on a stand-alone claim of actual innocence. See *McQuiggin,* 133 S.Ct. at 1931, citing *Herrera v. Collins,* 506 U.S. 390, 404–05, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). To win federal relief, a petitioner must show an independent constitutional violation. But when a petitioner accompanies his persuasive showing of actual innocence with a different claim for relief— here, ineffective assistance of counsel or the denial of due process—actual innocence may be used as a "gateway" to excuse procedural defaults that would otherwise bar a federal court from reaching the merits of the underlying claims. See *id.* at 1931–32.

■ In federal habeas law, the actual innocence exception is one application of the broader "fundamental miscarriage of justice" exception to procedural default intended to ensure that "federal constitutional errors do not result in the incarceration of innocent persons." *Id.* at 1931, quoting *Herrera,* 506 U.S. at 404, 113 S.Ct. 853. The Supreme Court has made clear

---

**1.** The Calhoun discovery does not directly support the due process claim, so it is possible that each claim would present a different date on which to begin the timeliness calculation. As we noted in *Taylor v. Michael,* 724 F.3d 806, 809 n. 3 (7th Cir.2013), we have yet to decide how to evaluate the timeliness of habeas petitions that present multiple claims.

While all circuit courts addressing this issue have determined that the best approach is to evaluate timeliness on a claim-by-claim basis, see *id.,* we have yet to foreclose the possibility of considering all claims if one claim is timely. Because no individual claim by Gladney is timely, we need not resolve this issue.

that this exception covers all sorts of procedural defaults and recently explained that it covers the procedural default at issue here: Gladney's failure to comply with § 2244(d)(1). See *id.* at 1931–32.

■ The actual innocence gateway is narrow. Gladney's procedural default can be excused only if he "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup,* 513 U.S. at 316, 115 S.Ct. 851. Gladney must show that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell,* 547 U.S. 518, 537, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), quoting *Schlup,* 513 U.S. at 327, 115 S.Ct. 851; see also *McQuiggin,* 133 S.Ct. at 1935.

■ Gladney's gateway claim of actual innocence under *Schlup* could be viable only if he presents evidence not previously considered. Such new evidence can take the form of any "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." See *Schlup,* 513 U.S. at 324, 115 S.Ct. 851. The reviewing court then considers the total record—"all the evidence, old and new, incriminatory and exculpatory"—and makes "a probabilistic determination about what reasonable, properly instructed jurors would do." *House,* 547 U.S. at 538, 126 S.Ct. 2064, quoting *Schlup,* 513 U.S. at 327–28, 329, 115 S.Ct. 851. It is not the role of the court to "make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

Gladney argues that two developments since his trial meet the *Schlup* standard of actual innocence: (1) the Wisconsin Supreme Court's modification of the law of imperfect self-defense in *State v. Head,* 255 Wis.2d 194, 648 N.W.2d 413 (2002), and (2) Calhoun's testimony corroborating that Wilson had robbed Gladney a few weeks before the fatal encounter.

### 1. *Change in State Law*

When Gladney was convicted, the controlling case on imperfect self-defense in Wisconsin was *State v. Camacho,* 176 Wis.2d 860, 501 N.W.2d 380 (1993), which required a defendant asserting it to meet an objective threshold requirement. Under *Camacho,* in essence, a killing that would otherwise be treated as first-degree intentional homicide would be reduced to second-degree intentional homicide if the accused (a) had an objectively reasonable belief that he was preventing or terminating an unlawful interference with his person; and (b) had either (1) "an actual, but unreasonable, belief that force was necessary because the unlawful interference resulted in an imminent danger of death or great bodily harm," or (2) a reasonable belief that some degree of force was necessary but had an unreasonable belief about the amount of force needed. *See id.* at 388–89; see also *Head,* 648 N.W.2d at 432–33 (describing the rule under *Camacho* ).

[10] In *State v. Head,* the Wisconsin Supreme Court modified the imperfect self-defense standard to make it easier for defendants to satisfy. The court made clear that a defendant need not make the threshold showing that he held "an objectively reasonable belief in the existence of an unlawful interference." 648 N.W.2d at 434. Following this change in the law, a defendant can prevail on the imperfect self-defense claim if she has an "*actual* but unreasonable belief that she was in imminent danger of death or great bodily harm and an *actual* but unreasonable belief that

the force she used was necessary to defend herself." *Id.* To convict of first-degree intentional homicide under the new standard, the State must show that the "defendant did not have an *actual* belief in one or both elements." *Id.*

Gladney argues that under the *Head* standard, he would be found actually innocent of first-degree intentional homicide. That argument raises a new question in this circuit, which is whether the *Schlup* actual innocence standard can be satisfied by a change in law rather than new evidence. See 513 U.S. at 324, 115 S.Ct. 851 (emphasizing need for new evidence). Gladney urges us to adopt the view that a petitioner can demonstrate actual innocence by showing "in light of subsequent case law that he cannot, as a legal matter, have committed the alleged crime." *Vosgien v. Persson,* 742 F.3d 1131, 1134 (9th Cir.2014); see also *Phillips v. United States,* 734 F.3d 573, 581 n. 8 (6th Cir. 2013) (declining "to accept the government's suggestion that in *McQuiggin,* the Court meant to limit actual innocence claims to those instances where a petitioner presents new facts ... and by implication to undermine those cases that have applied an equitable exception in cases where the innocence is occasioned not by new evidence but by an intervening, controlling change in the law as applied to a static set of facts").

We need not resolve that broader question here because the Wisconsin Supreme Court has made it clear that the rule announced in *Head* does not apply to defendants in Gladney's position. In *State v.*

*Lo,* 264 Wis.2d 1, 665 N.W.2d 756, 770–72 (2003), the Wisconsin Supreme Court explained that the interpretation of the imperfect self-defense rule announced in *Head* was a "new rule" that would not apply retroactively to cases on collateral review. In other words, defendants like Gladney convicted under the "reasonable belief" threshold test of *Camacho* were not entitled to benefit from *Head's* more defendant-friendly rule because it was not the law at the time their convictions became final. See *id.* at 773–74. The state court of appeals reviewing Gladney's claims said as much, concluding that "*Camacho* was the law in this state during the trial and postconviction proceedings, and therefore, the circuit court was obliged to follow it."

■ Gladney resists the holding of *Lo,* explaining all the ways that the state court may have gotten the retroactivity analysis wrong. Whether a state must make retroactive changes in state law, however, is itself ordinarily a matter of state law. As a general rule, the federal Constitution "neither prohibits nor requires" retroactive application of a state's judicial decisions. *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *disapproved on other grounds by Griffith v. Kentucky,* 479 U.S. 314, 320–22, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); see also *Wainwright v. Stone,* 414 U.S. 21, 23–24, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973) (state supreme court was not compelled "to make retroactive its new construction of the [state] statute").[2] States are free to

---

**2.** By contrast, if a state court holds that a subsequent interpretation of a statute was the correct statement of the law at the time a defendant's conviction became final, the Due Process Clause requires giving petitioners on collateral review the benefit of that subsequent interpretation. See *Fiore v. White,* 531 U.S. 225, 228–29, 121 S.Ct. 712, 148 L.Ed.2d

629 (2001) (per curiam); *Bunkley v. Florida,* 538 U.S. 835, 839–842, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003) (per curiam). The Wisconsin court avoided any constitutional problem here by holding that *Camacho*—and not *Head*—was the correct view of the imperfect self-defense statute until *Head* came along. See *Bunkley,* 538 U.S. at 841, 123 S.Ct. 2020

choose whether a change in state law is retroactive without running afoul of the federal Constitution. See *Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 77 L.Ed. 360 (1932) ("A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions."). The *Lo* court did exactly that, concluding as a matter of Wisconsin law that the change in law announced in *Head* would not be applied retroactively. See 664 N.W.2d at 772.

Gladney presents no federal constitutional issue and no ground upon which we could grant habeas relief because a "federal court may not issue the writ on the basis of a perceived error of state law." See *Holman v. Gilmore*, 126 F.3d 876, 884 (7th Cir.1997), quoting *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); see also *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Burris v. Farley*, 51 F.3d 655, 659–60 (7th Cir.1995). Accordingly, Gladney cannot rely on subsequent state case law on imperfect self-defense to establish his actual innocence and thereby to excuse his late federal habeas petition.

### 2. *New Evidence*

Gladney's other argument for actual innocence is based on the testimony of Calhoun about Wilson's earlier robbery of Gladney. To be sure, this evidence cannot be considered newly discovered—in the way that would be required for equitable or statutory tolling—because Gladney had

been aware of Calhoun's presence at the robbery. But the *Schlup* actual innocence gateway does not require that the new evidence be newly discovered. We have rejected limiting the *Schlup* inquiry to newly discovered evidence: "All *Schlup* requires is that the new evidence is reliable and that it was not presented at trial." See *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir.2003) ("[N]othing in *Schlup* indicates that there is such a strict limitation on the sort of evidence that may be considered."); see also *Schlup*, 513 U.S. at 324, 115 S.Ct. 851 (permitting any new evidence to be considered so long as it was "not presented at trial"). So long as the evidence was "genuinely not presented to the trier of fact then no bar exists to the habeas court evaluating whether the evidence is strong enough to establish the petitioner's actual innocence." *Gomez*, 350 F.3d at 680.

The Supreme Court has since explained that we were right to conclude that "the absence of a newly 'discovered' requirement in *Schlup*" was not a "mere oversight." *Id.* at 679. In *McQuiggin*, the Court made clear that the threshold diligence requirement of equitable tolling and § 2244(d)(1)(D) tolling does not apply when a court is considering whether evidence is new for the purposes of the actual innocence inquiry. See 133 S.Ct. at 1935. Unexplained delay in presenting such evidence is not an absolute bar, though it may play a role in determining whether a petitioner has proven his actual innocence: a delayed petition "should seriously undermine the credibility of the actual-innocence claim." See *id.* at 1935–36 (whether petitioner should have known about new evidence earlier is only relevant "as part of

---

("Ordinarily, the [state] Court's holding that [intervening precedent] constitutes a change in—rather than a clarification of—the law would be sufficient to dispose of the *Fiore*

question."). Thus, petitioner Gladney, like petitioner *Lo*, was convicted under the applicable state-law standard.

the assessment whether actual innocence has been convincingly shown."). Since Calhoun's testimony about the earlier robbery was not presented at trial, it can be considered for Gladney's actual innocence gateway theory, though any unexplained delay calls for some skepticism on our part.

Gladney has failed to meet *Schlup's* demanding standard for actual innocence. We are not convinced that it is more likely than not that no reasonable juror would have convicted him even in light of Calhoun's testimony that the robbery actually took place. Under Wisconsin's law of imperfect self-defense, under both *Camacho* and *Head,* the State could convict Gladney of first-degree intentional homicide if it could persuade a jury that Gladney did not actually believe that he was in imminent danger of great bodily harm or death or did not actually believe that the amount of force used was necessary to prevent that harm. See *Head,* 648 N.W.2d at 437. Nothing in Calhoun's statement, which focuses on the circumstances of the robbery several weeks earlier, bears directly on Gladney's mental state at the time of the shooting: that he actually believed he was acting to prevent harm to himself when he shot and killed Wilson. There is no indication that Calhoun would have testified, for example, that Gladney had discussed with him after the robbery that he lived in fear that Wilson would kill him. Further, and contrary to Gladney's suggestion, the state trial court did not definitively establish that Gladney had the actual belief necessary to make out an imperfect self-defense claim. The trial court language to which he points—the court's conclusion that Gladney "intentionally fired to get him off of him" and that his testimony showed that his defense was self-defense—is best understood in the context in which it was used: explaining that the court would not give a reckless homicide instruction be-cause no juror could find that it was a reckless homicide rather than an intentional one.

Even though Calhoun's testimony could not directly establish Gladney's mental state at the time of the killing, Gladney argues that Calhoun's testimony would have been decisive because it provided the only first-hand account—besides his own—that Wilson robbed Gladney at gunpoint several weeks before Gladney fatally shot him. Two other witnesses testified about the robbery, but neither had actually witnessed it. In Gladney's view, their relatively weak second-hand accounts enabled the State to cast doubt on whether the robbery actually took place. Calhoun's detailed account of the robbery—including that he feared he might be shot by Wilson, who was waving a pistol around while demanding everyone's money—would have made it harder for a reasonable juror to doubt that Gladney had been robbed.

For purposes of argument, we grant Gladney the premise that, in light of Calhoun's testimony, any reasonable juror would conclude that the earlier robbery took place. From that premise, Gladney argues that it necessarily follows that the same reasonable juror would be compelled to conclude that he actually believed he was acting in self-defense when he killed Wilson. That is a possible inference but by no means a required one. The actual innocence gateway of *Schlup* demands more than a possible inference that might lead a juror to acquit. To meet his heavy burden, Gladney must show it is likely that *no* reasonable juror would have convicted.

Gladney does not meet that standard. Calhoun was not a witness to the critical, fatal encounter. He corroborated an important point of Gladney's version of the back-story, but he provided no details of the fatal shooting itself. It would be rea-

sonable for a juror—even one who accepted that the robbery happened as Gladney described—to conclude that Gladney did not actually believe that the force used was necessary to protect himself from great bodily harm or death. As the State argued in state court, and again at oral argument, a juror hearing about the earlier robbery could reach one of two conclusions: Gladney killed Wilson out of a fear that he would otherwise be shot by Wilson; or, alternatively, Gladney killed Wilson because Gladney was angry that Wilson had robbed him and refused to repay the money he had taken.

■ On the record here, a reasonable juror could accept the second theory. The actual jury heard evidence that Gladney confronted Wilson about the robbery and brought a gun with him to do it. Gladney testified that the argument got "heated" once Wilson refused to pay up. Following that heated argument, the jury heard, Gladney pulled out a gun. He was the only person to pull a gun, and he shot Wilson multiple times. Of course, some testimony indicated that Wilson charged at Gladney and that the two struggled for control of the gun. But consistent with that testimony, a trier of fact might reasonably conclude that all this showed is that Gladney had threatened to kill Wilson—either verbally or by taking out his gun—as their argument escalated. A juror would not be required to conclude that Gladney actually believed he was acting in self-defense at the time he shot Wilson just because Gladney testified there was a struggle for the gun and that he shot Wilson only because he feared for his life. Accordingly, we are not convinced that no reasonable juror hearing Calhoun's testimony would have convicted him of first-degree intentional homicide. Without a strong showing of actual innocence re-

quired by *Schlup*, Gladney's petition is untimely and we cannot address its merits.

The judgment of the district court dismissing the habeas corpus petition as untimely is AFFIRMED.